FILED
Jul 17 2015, 10:02 am

CLERK
of the supreme court,
court of appeals and
tax court



ATTORNEY FOR APPELLANT

Joseph M. Johnson
Decatur, Indiana

Mark A. Thoma
Leonard Hammond Thoma & Terrill
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

David C. Ennik,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

July 17, 2015

Court of Appeals Case No.
90A02-1409-CR-664

Appeal from the Wells Circuit Court.

The Honorable Kenton W. Kiracofe, Judge.

Cause Nos. 90C01-1211-FA-3 & 90C01-1303-FC-5

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, David C. Ennik (Ennik), appeals his conviction for one Count of child molesting as a Class A felony, Ind. Code § 35-42-4-3(a)(1) (2012); and two Counts of child molesting as Class C felonies, I.C. § 35-42-4-3(b) (2012).

We affirm.

## ISSUES

Ennik raises two issues on appeal, which we restate as follows:

(1) Whether the trial court abused its discretion by denying Ennik's motion for severance; and

(2) Whether the trial court abused its discretion by admitting hearsay evidence.

## FACTS AND PROCEDURAL HISTORY[1]

T.W. (Father) and J.N. (Mother) are the biological parents of two daughters: K.N., born December 14, 2006, and M.W., born February 5, 2008. For the first few years of K.N.'s and M.W.'s lives, Mother was the custodial parent.

---

[1] In accordance with the revised Administrative Rule 9(G), certain evidence was submitted to our court which is declared confidential and must be excluded from public access. *See* Ind. Administrative Rule 9(G)(2). Despite the fact that the parties have only partially complied with the Administrative Rule, we have endeavored to maintain confidentiality on appeal. However, as a number of facts derived from the confidential records are "essential to the resolution of litigation[,]" we have included confidential information in this decision only to the extent necessary to resolve this appeal. Admin. R. 9(G)(7)(a)(ii)(c).

However, as both Father and Mother have frequently rotated in and out of jail/prison, K.N. and M.W. have had a very unstable childhood.

[5] At some point in 2008, Mother befriended Ennik. Mother was overwhelmed with two small children, so Ennik—who lived with his mother in Bluffton, Wells County, Indiana—offered to temporarily care for M.W. Ennik and his mother cared for and supported M.W. for approximately the first year of her life. Ennik also regularly babysat and provided financial support for K.N.

[6] In the fall of 2010, following an altercation between Mother and her then-boyfriend, the Department of Child Services (DCS) removed K.N. and M.W. from Mother's custody and, at Mother's request, placed them with Ennik. In November of 2010, Father was awarded custody of both girls. Shortly after obtaining custody, Father's wife, K.S., noticed that the girls were acting out in a sexualized manner, such as by looking at and inserting their fingers inside each other's private areas. K.S. informed Father of her observations. After consulting with family members as to whether such behavior was normal, Father believed that the girls were just experiencing a natural phase of curiosity. K.N. and M.W. also complained of painful urination and vaginal itching, so Father took them to a doctor who advised that Father should discontinue their bubble baths and use cream to treat their yeast infections.

[7] For a short period of time after Father was granted custody, Ennik did not have any contact with K.N. and M.W. However, at some point, Father had a discussion with Ennik and Ennik's mother and, after observing "how much

[K.N. and M.W.] loved [Ennik's] family," Father allowed Ennik, then age forty-seven, to resume his babysitting duties. (Tr. p. 497). For the next year, Father explained that Ennik babysat K.N. and M.W. approximately "every other weekend" for "[t]he whole weekend usually." (Tr. p. 484). Although Ennik sometimes babysat K.N. and M.W. inside his mother's house, at other times, he and the girls either stayed in his camper, which was parked in his mother's driveway, or he took them camping at his mother's other property in Ossian, Indiana. The last time Ennik babysat K.N. and M.W. was for a week in March of 2012 while Father and K.S. moved into their new home in Huntington, Indiana.

[8] In November of 2011, E.R.—another friend of Ennik's—moved to Bluffton with her husband and four children. Because their house was not yet ready, E.R. and her family had to live in a hotel for a brief period of time. However, in order for her oldest child, B.P.W., born December 15, 2004, to attend school, E.R. arranged for B.P.W. to live with Ennik for a few weeks. E.R. and her husband both worked second shift, so even after E.R.'s family moved into their new house, Ennik continued to babysit B.P.W. and her siblings through February of 2012. During the time that Ennik babysat B.P.W., K.N. and M.W. were also present on several occasions, and all three girls would sleep in the camper with Ennik.

[9] In December of 2011, Mother was incarcerated, and she was released on September 11, 2012. Immediately upon her release, Mother began exercising parenting time with five-year-old K.N. and four-year-old M.W. On September

22, 2012, during her weekend parenting time, Mother was bathing K.N. and M.W., and she explained to them that only she, Father, or K.S. should ever wash the girls. K.N. responded that Ennik "did" and when Mother inquired further, "K.N. just pointed to her private and held two fingers up and wiggled them." (Tr. pp. 371-72). When Mother questioned M.W., K.N. whispered to M.W. that it was okay to share the "secret" with Mother. (Tr. p. 371). Mother immediately contacted the police.

[10] On September 23, 2012, the Wells County DCS office commenced an investigation. DCS Family Case Manager Wendeline Garrett (FCM Garrett) interviewed K.N. and M.W. individually using the "Finding Words" methodology. (Tr. p. 152). Detective Sergeant Steven Cale (Detective Cale) of the Bluffton Police Department was present during the interviews, which were video recorded.

[11] During the interview with K.N., FCM Garrett asked whether she had ever received "a touch that somebody told you not to tell about." (Defendant's Exh. C, p. 18). K.N. answered affirmatively, stating that it was "somebody my mom knows. . . . His name is Dave"—*i.e.*, Ennik. (Defendant's Exh. C, p. 19). K.N. then repeatedly circled the vaginal area on an anatomical diagram to indicate why she did not like going to Ennik's. She stated that he had told her not to tell anyone that he had touched her there. K.N. also drew two "[f]ingers" on the diagram to show what part of Ennik's body had touched her, and she answered that he had touched her "[u]nder" her clothes and "[u]nder" her underwear, and his fingers were on the "[i]nside." (Defendant's Exh. C, pp. 22, 24-25, 27).

K.N. said that the touching occurred at Ennik's house, where he lives with his mom, and that she had been playing in the living room when Ennik "said come here." (Defendant's Exh. C, p. 23). K.N. added that "[h]e did it to my sister, too." (Defendant's Exh. C, p. 24). After answering that the touching had occurred "[m]ore" than one time, K.N. held up five fingers, then one finger, then ten fingers. (Defendant's Exh. C, p. 26). K.N. explained that the touching "hurt" and denied that Ennik had ever asked her to touch any part of his body. (Defendant's Exh. C, p. 29).

[12] On the other hand, M.W. initially denied that anyone had ever touched her in a way that she did not like. When specifically asked about Ennik, M.W. explained that he was their babysitter, and she liked going to his house because it was "[f]un." (Defendant's Exh. B, p. 16). M.W. stated that Ennik would help her take baths by washing her hair, but she washed her own body. Later in the interview, FCM Garrett informed M.W. that "[K.N.] talked to [Detective Cale] and I about a touch that she got on her body that she did not like, that it hurt. . . . [D]id she tell you about that?" (Defendant's Exh. B, p. 18). M.W. nodded her head yes and answered that "Dave"—*i.e.*, Ennik—had been the one who touched K.N. (Defendant's Exh. B, p. 19). M.W. then pointed to the vagina on an anatomical diagram to indicate where Ennik had touched K.N. When asked whether anyone had ever touched her there, M.W. nodded her head and answered that "Dave" had done so. (Defendant's Exh. B, p. 19). M.W. pointed to the fingers on the anatomical diagram to show what part of his body Ennik had used to touch her, and she answered that he touched her on

the "[o]utside" of her clothes and indicated that she did not like the touching. (Defendant's Exh. B, p. 20).

[13] On September 26, 2012, DCS received an anonymous tip, reporting that B.P.W. and her three younger sisters may also have been molested by Ennik while he babysat them. On October 5, 2012, FCM Garrett and Detective Cale interviewed B.P.W. and two of her siblings. At that time, neither B.P.W. nor her siblings disclosed any inappropriate touching by Ennik.

[14] On October 5, 2012, a registered nurse/sexual assault nurse examiner, Joyce Moss (Nurse Moss), conducted forensic examinations of K.N. and M.W. at the Fort Wayne Sexual Assault Treatment Center. K.N. informed Nurse Moss that Ennik "touched [her] with [two] fingers" "on [her] skin" and "on the inside." (Appellant's App. p. 824). K.N. pointed to her own internal female sex organs and anal folds to indicate where Ennik touched her and explained that "he said don't tell anyone." (Appellant's App. p. 824). K.N. also reported that "it hurt" and "burned when [she] peed." (Appellant's App. p. 824). Nurse Moss did not detect any physical injuries during her examination of K.N. At the start of her examination, M.W. identified the female genitalia as the "bottom" and referred to the buttocks as the "butt." (Appellant's App. p. 831). She then stated to Nurse Moss that Ennik "touched [her] bottom" on her "skin" and on the "inside" with his finger. (Appellant's App. p. 831). As she explained where she was touched, M.W. pointed to her own vagina. M.W. added that the touching occurred "one time" and "it hurted." (Appellant's App. p. 831). Nurse Moss did not detect any physical injuries during M.W.'s examination. At trial, the

parties stipulated to the admission of Nurse Moss' written reports, which included K.N.'s and M.W.'s statements.

[15] On November 13, 2012, the State filed an Information in Cause Number 90C01-1211-FA-000003 (Cause #003), charging Ennik with Count I, child molesting of K.N., a Class A felony, I.C. § 35-42-4-3(a)(1) (2012); and Count II, child molesting of M.W., a Class C felony, I.C. § 35-472-4-3(b) (2012).

[16] In March of 2013, E.R. noticed that B.P.W. was scratching her vagina, which led to "[a] mother/daughter conversation." (Tr. p. 505). B.P.W. then disclosed to E.R. that she had been afraid during her first interview with DCS five months earlier. She claimed that she did not tell the truth about Ennik and that he had, in fact, touched her vagina with his finger. E.R. contacted DCS, and on March 14, 2013, FCM Garrett and Detective Cale re-interviewed B.P.W. This time, B.P.W. alleged that Ennik had touched her vagina while she was lying in bed in his camper. On March 19, 2013, the State filed an Information in Cause Number 90C01-1303-FC-000005 (Cause #005), charging Ennik with one Count of child molesting of B.P.W., a Class C felony, I.C. § 35-42-4-3(b) (2012).

[17] On July 17 and 31, 2013, Dr. Amanda Mayle (Dr. Mayle), a clinical psychologist, met with K.N. and M.W. to assess their abilities to recount their allegations, understand the nature and obligation of an oath, and provide testimony in court. K.N. recalled that Ennik had "touched us on our bottoms, in the front" on one occasion while they were in the camper, and that his

fingers stayed on the "outside." (Defendant's Exh. D). On the other hand, M.W. stated that Ennik "touched [her] on the bottom" as she pointed to her vagina, while she was asleep in the camper, which caused her to wake up and yell. (Defendant's Exh. D). She also stated that Ennik had touched her on top of her clothes, that it happened twice, and that he told her not to tell anyone. On August 5, 2013, Dr. Mayle filed a report in which she determined that K.N. demonstrated "the ability to tell the difference between the truth and a lie and the importance of telling the truth and understand the nature of an oath." (Defendant's Exh. D). Dr. Mayle reached the same conclusion with respect to M.W. At trial, Dr. Mayle's written reports, which included the detailed statements of K.N. and M.W., were admitted pursuant to the parties' stipulation.

[18] On January 24, 2014, the State filed a Motion for Joinder of Offenses in Causes #003 and #005. On February 7 and 12, 2014, Ennik filed objections to the State's motion for joinder in Cause #005 and Cause #003, respectively. Following a February 12, 2014 hearing, on February 27, 2014, the trial court issued an Order granting the State's motion for joinder. In particular, the trial court found that "the nature of the offenses are of the same or similar character, [and] they are also based on the same conduct and are a series of acts connected together, namely [Ennik] allegedly molesting the children while babysitting and bathing them." (Appellant's App. p. 133). On March 7, 2014, Ennik filed a Motion to Reconsider Joinder, Alternatively, Motion for Severance, which the trial court denied on June 17, 2014.

[19]    On June 26 and 27, 2014, the trial court held a protected person hearing—*i.e.*, a child hearsay hearing—pursuant to Indiana Code section 35-37-4-6(e)(2)(B)(i) as to K.N. and M.W.[2]  During the hearing, Dr. Mayle testified that, based on her counseling sessions with K.N. and M.W., she did not "believe [M.W.] would be able to[] [communicate the facts in a jury trial setting with Ennik present in the courtroom]." (Tr. p. 171).  Likewise, Dr. Mayle explained that "[K.N.] would completely shut down as well." (Tr. p. 172).  In lieu of K.N. and M.W. testifying, the State sought to introduce the recorded interviews conducted by FCM Garrett and Detective Cale, as well as statements made by K.N. and M.W. to Mother, Nurse Moss, and Dr. Mayle.  Ennik was provided with the opportunity to cross-examine K.N. and M.W. via closed-circuit television at the protected person hearing.  In sharing her version of events for the fifth time, K.N. was initially reluctant to discuss the allegations.  However, she eventually stated that Ennik touched her on her skin with his fingers.  She added that she did not see him touch anyone else and that it did not hurt.  M.W. stated under oath that Ennik touched her one time in a "[b]ad spot" on top of her clothes and that she saw him touch K.N. and B.P.W. while they were all inside the camper. (Tr. p. 198).  On July 14, 2014, the trial court concluded that K.N. and M.W. were both unavailable to testify at trial "as testifying in the physical presence of [Ennik] would cause the children to suffer serious emotional distress such that they could not reasonably communicate."

---

[2]  B.P.W. was not part of the protected person hearing as she was found able to—and did—testify during the trial.

(Appellant's App. p. 276). Furthermore, the trial court concluded that the statements made by K.N. and M.W. to Mother and their recorded interviews with FCM Garrett and Detective Cale could be admitted at trial.

[20] A four-day jury trial commenced on August 4, 2014. At the close of the evidence on August 7, 2014, the jury returned a guilty verdict on all three Counts. On August 29, 2014, the trial court conducted a sentencing hearing and imposed a sentence of fifty years for child molesting as a Class A felony, and eight years on each of the two Class C felony child molesting charges. The trial court ordered Ennik's sentences to run consecutively, resulting in an aggregate term of sixty-six years, fully executed in the Indiana Department of Correction.

[21] Ennik now appeals. Additional facts will be provided as necessary.[3]

## DISCUSSION AND DECISION

### I. *Joinder/Severance*

[22] Before trial, the trial court, over Ennik's objection, granted the State's motion to join the offenses in Cause #003 and Cause #005. Thereafter, Ennik filed a Motion to Reconsider Joinder, Alternatively, Motion for Severance. Ennik now contends that the trial court erred in granting the State's motion for

---

[3] Contrary to Indiana Appellate Rule 44(D)-(E), Ennik's forty-eight page brief exceeds the thirty-page limit and does not include a certification that the word count is less than 14,000. We remind the parties that compliance with the appellate rules is essential for our court's efficient review of cases.

joinder, whereas the State asserts that the trial court properly denied Ennik's motion for severance.

[23] Once the State's motion for joinder was granted over Ennik's objection, proper procedure required him to file a motion for severance, which he did. *See* I.C. § 35-34-1-12(a) (stating that a motion for severance must be made before the start of trial, or before the close of evidence if based upon a ground not previously known, or the right to severance will be waived). Then, once his motion for severance was overruled, it was incumbent upon Ennik to renew his severance motion "before or at the close of all the evidence during trial." I.C. § 35-34-1-12(b). Here, because Ennik did not renew his severance motion during the trial, the State correctly argues that he has waived the matter for appeal. *See* I.C. § 35-34-1-12(b) ("The right to severance of offenses or separate trial is waived by failure to renew the motion."). Nevertheless, Ennik maintains that the causes were improperly joined notwithstanding his motion for severance, and he further contends that his objection to the joinder and subsequent motion to reconsider/motion for severance satisfies the statutory requirement for a renewal of the motion. Although we disagree and find that Ennik waived this issue for appeal by failing to renew his severance motion at trial, we will address his claim on the merits.

[24] "The degree of deference owed to a trial court's ruling on a motion for severance depends on the basis for joinder." *Pierce v. State*, 29 N.E.3d 1258, 1264 (Ind. 2015). Two or more offenses may properly be joined in the same information if the offenses: "(1) are of the same or similar character, even if not

part of a single scheme or plan; or (2) are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan." I.C. § 35-34-1-9(a). Indiana Code section 35-34-1-11(a) provides that a defendant has "an absolute right to severance of offenses which have been joined 'solely on the ground that they are of the same or similar character.'" *Davidson v. State*, 558 N.E.2d 1077, 1083 (Ind. 1990). Thus, where causes are joined solely under subsection 9(a)(1), *i.e.*, same or similar character, the trial court has no discretion to deny a severance motion, and we review its decision *de novo*. *Pierce*, 29 N.E.3d at 1264. However, if the offenses have been joined under subsection 9(a)(2) because the defendant's underlying acts are connected together, we review the trial court's ruling for an abuse of discretion. *Id.* In this case, the trial court found that joinder was appropriate because "the nature of the offenses are of the same or similar character" *and* because "they are based on the same conduct and are a series of acts connected together." (Appellant's App. p. 133).

[25] If two or more offenses could be joined in the same information because they are of the same or similar character, "the court, *upon motion of the defendant*, may order that the indictments or informations be joined for trial." I.C. § 35-34-1-10(a) (emphasis added). However, if two or more offenses may be joined based on the same conduct or a series of acts connected together or constituting a single scheme or plan, "the court, *upon motion of the defendant or the prosecuting attorney*, or on its own motion shall join for trial all of such indictments or informations unless the court, in the interests of justice, orders that one (1) or

more of such offenses shall be tried separately." I.C. § 35-34-1-10(b) (emphasis added). In this case, Ennik maintains that although the offenses charged under Cause #003 and Cause #005 are of the same or similar character, they are not based on the same conduct or on a series of acts connected together or parts of a single scheme or plan. Thus, because it was the State—not Ennik—which requested the joinder of Causes #003 and #005, Ennik posits that joinder was erroneous. And because he argues that the causes were joined only because of similar character, Ennik also claims that he was entitled to severance as a matter of right.[4] We disagree.

[26] "Subsection 9(a)(1) refers to the nature of the charged offenses; subsection 9(a)(2) refers to the operative facts underlying those charges." *Pierce*, 29 N.E.3d at 1265. "To determine whether offenses warrant joinder under subsection 9(a)(2), we ask whether the operative facts establish a pattern of activity beyond mere satisfaction of the statutory elements." *Id.* at 1266. Our supreme court has previously determined that joinder under subsection 9(a)(2) may be justified "'if the State can establish that a common *modus operandi* linked the crimes and that the same motive induced that criminal behavior.'" *Craig v. State*, 730 N.E.2d 1262, 1265 (Ind. 2000) (quoting *Ben-Yisrayl v. State*, 690 N.E.2d 1141,

---

[4] Ennik solely claims that he was entitled to severance as a matter of right; he does not argue that the trial court abused its discretion in joining the causes under subsection 9(a)(2) by failing to evaluate whether "severance is appropriate to promote a fair determination of the defendant's guilt or innocence of each offense considering: (1) the number of offenses charged; (2) the complexity of the evidence to be offered; and (3) whether the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense." I.C. § 35-34-1-11(a). Thus, we limit our review "to whether [Ennik's] 'absolute right to a severance of the offenses' was violated." *Booker v. State*, 790 N.E.2d 491, 494 (Ind. Ct. App. 2003), *trans. denied*.

1145 (Ind. 1997)). It is well established that offenses can "be linked by a defendant's efforts to take advantage of his special relationship with the victims." *Pierce*, 29 N.E.3d at 1266; *see Turnpaugh v. State*, 521 N.E.2d 690, 692 (Ind. 1988) (finding the molestation of two "young sisters who were overnight guests sufficiently shows that the misconduct in each case was part of a series of acts committed together and part of a single scheme or plan").

[27] In the present case, Ennik "exploited his position" as a babysitter by molesting three young females entrusted to his care. *Pierce*, 29 N.E.3d at 1266. Furthermore, Ennik's "method was consistent." *Id.* at 1267. While babysitting each of the three girls, Ennik touched their vaginas with his fingers. Each girl stated that on at least one occasion, the touching occurred while they were lying in bed in Ennik's camper. Accordingly, the trial court correctly found that joinder was proper under *both* subsection 9(a)(1) and 9(a)(2); thus, Ennik was not entitled to severance as a matter of right.

## II. *Admission of Hearsay*

### A. *Standard of Review*

[28] "[T]he decision to admit or exclude evidence is within a trial court's sound discretion and is afforded great deference on appeal." *Carpenter v. State*, 786 N.E.2d 696, 702 (Ind. 2003). Accordingly, our court will reverse a trial court's ruling on the admission of evidence only if "it represents a manifest abuse of discretion that results in the denial of a fair trial." *Id.* It is an abuse of discretion if "the trial court's decision is clearly against the logic and effect of

the facts and circumstances before the court or it misinterprets the law." *Trujillo v. State*, 806 N.E.2d 317, 323 (Ind. Ct. App. 2004).

B. *Indiana's Protected Person Statute*

[29] Ennik claims that the trial court abused its discretion by admitting into evidence the statements of K.N. and M.W. made to Mother and to FCM Garrett and Detective Cale during their recorded interviews.[5] A hearsay statement is one that "is not made by the declarant while testifying at the trial or hearing" and "is offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule 801(c). In general, hearsay is not admissible unless the Rules of Evidence specifically provide otherwise. Evid. R. 802. It is undisputed that K.N.'s and M.W.'s statements to Mother, as well as their recorded interviews with FCM Garrett and Detective Cale, constitute hearsay.

[30] "Hearsay is excluded from judicial proceedings because 'its admission defeats the criminal defendant's right to confront and cross-examine witnesses against him.'" *Carpenter*, 786 N.E.2d at 698 (quoting *Williams v. State*, 544 N.E.2d 161, 162 (Ind. 1989)). Yet, hearsay evidence also "often helps the jury find the truth; excluding hearsay testimony can deny the jury crucial evidence." *Id.* "[I]n an effort to balance these competing interests," the Indiana General Assembly has enacted special procedures for introducing evidence that would otherwise be inadmissible in cases involving crimes against children. *Id.* at 698-99. Indiana

---

[5] Ennik concedes that he stipulated to the admission of the hearsay statements made by K.N. and M.W. to Nurse Moss and Dr. Mayle; thus, he does not challenge them on appeal.

Code section 35-37-4-6—the "Protected Person Statute"—enumerates "a detailed set of conditions" under which a child's hearsay statements are admissible. *Id.* at 699.

[31] The Protected Person Statute defines a "protected person," in part, as "a child who is less than fourteen (14) years of age." I.C. § 35-37-4-6(c)(1). A statement or videotape that is made by a protected person, and which would otherwise be inadmissible hearsay, may be admitted in a criminal action involving a sex offense if it concerns a material element of the charged offense and if the following conditions are satisfied:

> (1) The court finds, in a hearing:
>    (A) conducted outside the presence of the jury; and
>    (B) attended by the protected person in person or by using closed circuit television testimony . . . ;
>    that the time, content, and circumstances of the statement or videotape provide sufficient indications of reliability.
> (2) The protected person:
>    (A) testifies at the trial; or
>    (B) is found by the court to be unavailable as a witness for one (1) of the following reasons:
>       (i) From the testimony of a psychiatrist, physician, or psychologist, and other evidence, if any, the court finds that the protected person's testifying in the physical presence of the defendant will cause the protected person to suffer serious emotional distress such that the protected person cannot reasonably communicate.
>       (ii) The protected person cannot participate in the trial for medical reasons.

> (iii)  The court has determined that the protected person is incapable of understanding the nature and obligation of an oath.

I.C. § 35-37-4-6(d)-(e); *see* I.C. § 35-37-4-6(b)(2).  Considerations for determining whether a protected person's hearsay statements are sufficiently reliable include:  "(1) the time and circumstances of the statement, (2) whether there was significant opportunity for coaching, (3) the nature of the questioning, (4) whether there was a motive to fabricate, (5) use of age appropriate terminology, and (6) spontaneity and repetition."  *Surber v. State*, 884 N.E.2d 856, 862 (Ind. Ct. App. 2008), *trans. denied*.  "There are undoubtedly many other factors in individual cases."  *Pierce v. State*, 677 N.E.2d 39, 44 (Ind. 1997).

[32]  Here, the trial court found that K.N. and M.W.—both less than fourteen years of age—were unavailable to testify based on Dr. Mayle's opinion that they would suffer serious emotional distress such that they would be unable to reasonably communicate.  The trial court further concluded that the time, content, and circumstances of K.N.'s and M.W.'s statements and recorded interviews provided sufficient indications of reliability.  Relying on *Pierce* and *Carpenter*, Ennik now asserts that K.N.'s and M.W.'s statements were not sufficiently reliable because (1) their statements "were made *long* after any alleged molestation"; (2) their statements to law enforcement were inconsistent with the statements made to Mother, Nurse Moss, and Dr. Mayle; (3) FCM Garrett's questioning was "suggestive"; (4) there was no independent corroboration of their statements; and (5) "[t]here is evidence to suggest the 'implantation' of a story."  (Appellant's Br. pp. 45-46).

[33]     In *Pierce*, our supreme court affirmed the trial court's reliability determination regarding statements a child had made to her mother and police officers, as well as her videotaped interview. 677 N.E.2d at 39. First, the court concluded that the child's "statements were spontaneous and occurred 'a very short time' after the alleged molestation." *Id.* at 45. The child's answers were neither prompted nor suggested, and the child's mother was available for cross-examination "as to the potential for any implantation or cleansing of [the child's] story." *Id.* The supreme court noted its concern with the delay of several hours between the alleged molestation and the child's videotaped interview as the "passage of time tends to diminish spontaneity and increase the likelihood of suggestion." *Id.* Also, the interview occurred *after* the child's "potentially disorienting physical examination at a doctor's office[,]" and the child's mother "suggested several answers to [the child] during the interview and asked her leading questions." *Id.* Nonetheless, the child's statements were consistent with her previous spontaneous statements and were in her own words, and the *Pierce* court found "no showing that the videotape was more than cumulative of the statements [the child] made immediately following the incident." *Id.*

[34]     Conversely, in *Carpenter*, our supreme court reversed the trial court's determination that a child's statements to her mother and grandfather and her videotaped interview with DCS were reliable. 786 N.E.2d at 696. First, there was "no evidence at all as to when the alleged molestation occurred." *Id.* at 703. In the charging information, the State alleged "a period exceeding six weeks during which the alleged molestation could have taken place[,]" but there

was no indication that the disclosure was made close in time to the molestation. *Id.* Second, because the child's statements to her grandfather were made a full day after her disclosure to her mother and the videotaped interview, there was an opportunity for "implantation or cleansing." *Id.* at 704. Finally, the *Carpenter* court noted that the child was unable to distinguish between the truth and a lie, and "there is a degree of logical inconsistency in deeming reliable the statements of a person who cannot distinguish truth from falsehood." *Id.*

[35] In this case, there was a significant gap between the alleged molestation and K.N.'s initial disclosure to Mother. Similar to *Carpenter*, the date of the molestation is unclear. Because K.N. and M.W. were unable to pinpoint a specific timeframe except to indicate that it occurred while Ennik was babysitting and while they were living with Father because Mother was incarcerated, the State charged that the alleged molestation could have taken place anytime between December 1, 2010, and December 31, 2011—a span of thirteen months. K.N. did not report the abuse to Mother until September 22, 2012. Thus, anywhere from nine to twenty-two months passed between the actual molestation and K.N.'s initial disclosure. While this substantial passage of time certainly casts doubt on the reliability of the girls' statements, we are mindful that it is "only one factor to be considered and is not necessarily dispositive." *Mishler v. State*, 894 N.E.2d 1095, 1100 (Ind. Ct. App. 2008), *trans. denied*. As the trial court found, "[c]ommon sense and experience have shown that rarely do children disclose abuse or molestation immediately after it occurs." (Appellant's App. p. 276). We also take into account the evidence

establishing that K.N. and M.W. both loved and trusted Ennik, and they consistently stated throughout the investigation that Ennik had warned them not to tell anyone about the touching.

[36]     It is also important to consider that K.N.'s statements were made spontaneously in response to Mother's instructions that only she, Father, and K.E. should ever bathe them. *See Trujillo*, 806 N.E.2d at 327 (noting the child's statements were made "in response to her mother's non-leading, non-suggestive inquiry about how her day had gone"). The next day, Mother took K.N. and M.W. to be interviewed at the DCS office, and both girls disclosed inappropriate touching by Ennik. Regarding any concern that the delay provided an opportunity for Mother to plant a story or coach the girls, Mother testified that she did not discuss the matter with the girls between K.N.'s initial disclosure and their interview with FCM Garrett. *See A.R.M. v. State*, 968 N.E.2d 820, 826 (Ind. Ct. App. 2012) (finding no abuse of discretion in the trial court's reliability determination where there was no evidence that the child's mother "discussed the incident with [the child] again before [the child] was interviewed . . . , let alone coached him"). Moreover, Mother was available for cross-examination at the protected person hearing regarding the possibility that she planted or coached the children's versions of events. Instead, Mother testified that prior to K.N.'s disclosure in the bathtub, she had no reason to suspect that Ennik would ever touch the girls inappropriately as he had been a close friend and had always helped her by taking care of the girls.

[37] "Doubt may be cast on the reliability of the statement or videotape if it is preceded by lengthy or stressful interviews or examinations." *Taylor v. State*, 841 N.E.2d 631, 635 (Ind. Ct. App. 2006), *trans. denied*. Whereas the *Pierce* and *Carpenter* courts found it concerning that the children were interviewed after physical exams, here, K.N. and M.W. were not physically examined by Nurse Moss until several weeks *after* their interviews with FCM Garrett. Also, distinct from *Pierce*, Mother was not present during K.N.'s and M.W.'s recorded interviews and thus could not suggest answers. However, Ennik asserts that FCM Garrett's questions were suggestive, as evidenced by the fact that M.W. denied being touched until FCM Garrett "suggested to her that K.N. had said something to them." (Appellant's Br. p. 45). The record reveals that FCM Garrett was trained in interviewing techniques for young children and relied on the Finding Words methodology, which is a generally accepted approach for interviewing a child in a molestation case. FCM Garrett did not suggest the identity of the person who may have touched K.N., nor did FCM Garrett offer the details of the touching, such as where K.N. was touched and with what body part. Rather, M.W. volunteered that "Dave" had touched K.N. with his fingers, and she pointed to the vagina on the anatomical diagram. (Defendant's Exh. B, p. 19). Thereafter, M.W. acknowledged that Ennik had also touched her in the same manner.

[38] Although there were some inconsistencies in each of the girls' subsequent statements to Nurse Moss and Dr. Mayle—such as the number of times the touching occurred—K.N. and M.W. consistently reported that Ennik touched

their vaginas with his fingers. Furthermore, it was up to the trial court, as the trier of fact during the protected person hearing, to make a decision based on its assessment of K.N.'s and M.W.'s credibility, and Dr. Mayle testified at the hearing that "at this age[,]" it would not be uncommon for children to "give different information to different people." (Tr. p. 170). Moreover, K.N. and M.W. were subject to cross-examination, which was recorded and played for the jury, and Ennik was able to point out the inconsistencies in the girls' statements to the trier of fact. *See Carpenter*, 786 N.E.2d at 701.

[39] The evidence also establishes that K.N. and M.W. had no motive to fabricate a story. During the protected person hearing, both Father and Mother testified that K.N. and M.W. loved Ennik and enjoyed spending time with him. Detective Cale testified that he is trained to detect signs that a child has been coached, and he observed no signs that either K.N. or M.W. were coached, and he further stated that both girls used age-appropriate language to describe the molestation. FCM Garrett also testified that she observed no indications that K.N.'s or M.W.'s responses were coached. In *Carpenter*, the supreme court found it significant that the child was unable to distinguish the difference between the truth and a lie. Here, Dr. Mayle testified at the protected person hearing that both K.N. and M.W. knew the difference between a truth and a lie, and during their cross-examinations, both girls swore to tell the truth.

[40] Finally, as to Ennik's claim that there was no independent corroboration of M.W.'s or K.N.'s statements, *i.e.*, the detection of a physical injury during the medical examination, it is well established that "[c]orroboration should not be

considered when determining the reliability of the statement because Indiana Code section 35-37-4-6 does not limit admission only to statements where there is independent corroborative evidence of the crime." *M.T. v. State*, 787 N.E.2d 509, 512 (Ind. Ct. App. 2003). Under all of these facts and circumstances, we cannot conclude that the trial court abused its discretion in admitting K.N.'s and M.W.'s statements to Mother and their recorded interviews with FCM Garrett and Detective Cale.

## CONCLUSION

[41] Based on the foregoing, we conclude that the trial court acted within its discretion in denying Ennik's motion for severance, and the trial court did not abuse its discretion by admitting the hearsay statements of Mother and the recorded interviews with FCM Garrett and Detective Cale.

[42] Affirmed.

[43] Bailey, J. and Barnes, J. concur