## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

ATTORNEY FOR APPELLANT

Christopher Taylor-Price
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Josiah Swinney
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Kenneth Gregory Hudgins,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

August 19, 2020

Court of Appeals Case No.
20A-CR-205

Appeal from the Marion Superior Court

The Honorable Christina R. Klineman, Judge

The Honorable Marshelle Dawkins Broadwell, Magistrate

Trial Court Cause Nos.
49G17-1906-F6-22909
49G17-1906-F6-23116

**FILED**
Aug 19 2020, 8:23 am
**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

**Najam, Judge.**

# Statement of the Case

The State charged Kenneth Hudgins with various crimes in two causes numbers based on offenses Hudgins had allegedly committed at two locations on the same date. The State then moved to have the two causes joined for trial, which motion the trial court granted. Hudgins now appeals his convictions following a jury trial for criminal recklessness, as a Level 6 felony; resisting law enforcement, as a Level 6 felony; intimidation, as a Level 6 felony; battery on a public safety official, as a Level 6 felony; two counts of battery by bodily waste, as Level 6 felonies; domestic battery, as a Class A misdemeanor; and criminal mischief, as a Class B misdemeanor.

Hudgins raises one issue for our review, namely, whether the trial court abused its discretion when it granted the State's motion to join the two causes for trial. We also address *sua sponte* whether the trial court's written sentencing order erroneously describes one of Hudgins' convictions. We affirm and remand with instructions.

# Facts and Procedural History

On the morning of June 9, 2019, Hudgins and his girlfriend, Katrina Henton, were at Henton's home discussing whether they were going to help Hudgins' brother move. Henton initially agreed to help, but she later changed her mind. Hudgins got "upset" and hit Henton in her "face and [her] ear." Tr. Vol. II at 122, 123. As a result, Henton fell and hit her head on the wall. Henton said that she was going to call 9-1-1, but Hudgins took her phone and broke it.

Hudgins then left, and Henton went to her neighbor's house to call 9-1-1. Medics arrived and treated Henton's injuries. While she was being treated, Hudgins returned to the house. Henton remained in the ambulance while she waited for officers to arrive.

[4] Officers Michael Harmon, Jaqueline Piekarz, and John Lyn with the Indianapolis Metropolitan Police Department ("IMPD") arrived at the scene at 7:44 a.m. Officer Harmon observed that Henton was "shaking" and "clearly upset." *Id*. at 101. Based on the conversation that the officers had had with Henton, they attempted to speak with Hudgins. The officers knocked on the door, but they did not get a response. The officers then retrieved the house key from Henton. As they started to unlock the door, Hudgins began yelling that he had knives and that he "was going to kill" the officers if they entered the house. *Id*. at 145. Officer Harmon then called for backup, and several additional officers arrived.

[5] Hudgins continued to refuse to leave the house. So officers informed Hudgins that they were going to call a SWAT Team. At that point, Hudgins, holding a knife, exited the house and ran toward Officer Lyn. Officers instructed Hudgins to stop and drop the knife, but he refused. Hudgins then "slipped" and fell to the ground. *Id*. at 109. But he got back up and continued running toward Officer Lyn with the knife. Out of concern for his safety, Officer Lyn tased Hudgins. Hudgins then fell onto his stomach with the knife underneath him. Officer Lyn instructed Hudgins to show his hands, but Hudgins refused. Instead, Hudgins "curled up" and put his hands under his body. *Id*. at 187.

Officer Lyn was concerned that Hudgins may be reaching for the knife, so he tased Hudgins again. Officers were still unable to restrain Hudgins, so Officer Lyn tased Hudgins a third time. Officers were ultimately able to restrain Hudgins. They then called for medics to make sure that Hudgins was not injured from either of the falls or from the taser.

[6] When the medics arrived, officers and medics moved Hudgins to a gurney so that he could be transported to the hospital. Hudgins became "very aggressive" toward the medics and tried to bite them. *Id*. at 192. He then spat at the medics, so officers put a "spit mask" over his face. *Id*. at 115. Hudgins also threatened to kill the officers "several times," and he made "vulgar threats" toward Officer Piekarz. *Id*. Medics ultimately transported Hudgins to Eskenazi hospital, and Officer Lyn followed along "for the safety of the medical crew." *Id*. at 193.

[7] Hudgins arrived at the hospital at approximately 11:00 a.m. When he arrived, Marion County Sheriff Deputy Michael Winston observed that Hudgins was "double-cuffed," which usually happens when a person is "out of control." *Id*. Based on what officers had told Deputy Winston about Hudgins' actions at Henton's house, Deputy Winston moved Hudgins from the holding room into a private room.

[8] Deputy Winston left Hudgins' room "to do a round" and check on the other patients who were detained. *Id*. at 226. When he returned, Hudgins was no longer in his room. The nurse had moved him to a "shock room" because his

oxygen saturation levels were low. *Id*. at 244. Hudgins remained in the shock room for ten to fifteen minutes.

[9] When he came back to his room, Hudgins was "agitated." *Id*. at 237. He began yelling, and he threatened "to throw urine" on a nurse. *Id*. at 228. Hudgins then tore the medical leads off of his body and put them in his mouth. Deputy Winston and Marion County Sheriff Deputy Ernest Wesley entered Hudgins' room and attempted to remove the leads from Hudgins' mouth. At that point, Hudgins kicked Deputy Winston "square in the chest." *Id*. at 229. Hudgins then kicked Deputy Winston a second time in the stomach. And Hudgins spit a mixture of "saliva and blood" at both Deputy Winston and Deputy Wesley. *Id*. at 232.

[10] On June 10, the State charged Hudgins with one count of battery against a public safety official, as a Level 6 felony, and two counts of battery by bodily waste, as Level 6 felonies, in Cause Number 49G18-1906-F6-22909 based on Hudgins' actions at the hospital ("the hospital case"). And, on June 11, the State charged Hudgins with resisting law enforcement, as a Level 6 felony; criminal recklessness, as a Level 6 felony; intimidation, as a Level 6 felony; domestic battery, as a Class A misdemeanor; battery, as a Class A misdemeanor; resisting law enforcement, as a Class A misdemeanor; interference with the reporting of a crime, as a Class A misdemeanor; and criminal mischief, as a Class B misdemeanor, in Cause Number 49G17-1906-F6-23116 based on Hudgins' actions at Henton's house ("the house case").

[11]     Thereafter, the State filed a motion for joinder in which it requested that the hospital case and the house case be joined for trial. The State specifically asserted that "[b]oth cases allege incidents that happened on June 9th, 2019" and that the offenses were "a series of continuous events, one leading into the other[,] which makes this one common scheme or plan." Appellant's App. Vol. II at 130.

[12]     The trial court held a hearing on the State's motion on November 14, 2019. At the hearing, the State reiterated its argument that the offenses were "part of the same . . . series of acts." Tr. Vol. II at 4. In response, Hudgins agreed that "there are some circumstances that link" the two offenses and that "they are closely related in time." *Id*. at 7. But Hudgins objected to having the two causes joined for trial because "there's no overlap in witnesses [and] there are no overlaps in facts that would determine one . . . way or another whether or not this did or did not happen." *Id*. He also asserted that the "sole purpose" of joining the house case to the hospital case would be to introduce evidence of a prior bad act, which would be prejudicial to him. *Id*. Following the hearing, the court granted the State's motion for joinder.

[13]     Prior to Hudgins' trial, the State dismissed the charge for resisting law enforcement, as a Class A misdemeanor. Following a jury trial, the jury found Hudgins not guilty of interference with the reporting of a crime, as a Class A misdemeanor, but found him guilty of the remaining charges. The trial court entered judgment of conviction accordingly but later vacated his conviction for battery, as a Class A misdemeanor, due to double jeopardy concerns. The court

then sentenced Hudgins to an aggregate sentence of six and one-half years, with four and one-half years executed and two years suspended. This appeal ensued.

## Discussion and Decision

[14] Hudgins contends that the trial court erred when it granted the State's motion to join the two causes for trial. Pursuant to Indiana Code Section 35-34-1-9(a), two or more offenses may properly be joined in the same information if they "(1) are of the same or similar character, even if not part of a single scheme or plan; or (2) are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan." Ind. Code § 35-34-1-9(a) (2020). Where, as here, offenses have been joined under subsection (a)(2) because the underlying acts are so connected together, we review a trial court's ruling for an abuse of discretion. *See Ennik v. State*, 40 N.E.3d 868, 875 (Ind. Ct. App. 2015), *trans. denied*. An abuse of discretion occurs where the decision is clearly against the logic and effect of the facts and circumstances or when the trial court has misinterpreted the law. *State v. Dixon*, 924 N.E.2d 1270, 1271 (Ind. Ct. App. 2010).

[15] As an initial matter, we note that, while Hudgins objected to the State's motion for joinder, he did not file a motion for severance. Once the State's motion for joinder was granted over Hudgins' objection, "proper procedure required him to file a motion for severance." *Ennik*, 40 N.E.3d at 875; *see also* I.C. § 35-24-1-12(a) (stating that a motion for severance must be made before trial or by the close of the evidence if based on a ground not previously known and that the

right to severance is waived by failing to file a motion at the appropriate time). Because Hudgins failed to file a motion for severance, we conclude that he has waived this issue for our review. *See Ennik*, 40 N.E.3d at 875.

[16] Waiver notwithstanding, we cannot say that the trial court abused its discretion when it granted the State's motion for joinder. As discussed above, the State moved to join the hospital case and the house case because the two offenses were based on the same conduct or on a series of acts connected together or constituting a single plan or scheme. *See* I.C. § 35-34-1-9(a)(2). To determine whether offenses warrant joinder under subsection (a)(2), we ask whether the operative facts establish a pattern of activity beyond mere satisfaction of the statutory elements. *Ennik*, 40 N.E.3d at 876. Joinder under that subsection "may be justified 'if the State can establish that a common *modus operandi* linked the crimes and that the same motive induced that criminal behavior.'" *Id*. (quoting *Craig v. State*, 730 N.E.2d 1262, 1265 (Ind. 2000)).

[17] On appeal, Hudgins asserts that the court abused its discretion when it granted the State's motion for joinder because the hospital case occurred after Hudgins was arrested for the house case, the two offenses occurred in different locations, there was "no overlap" between witnesses, and each case had "separate and distinct" victims. Appellant's Br. at 16. He also asserts that the cases were not connected because "the means used [to commit the offenses] in the house case was a knife, words, and Hudgins' hand, whereas in the hospital the means were spit and Hudgins' foot." *Id*. at 17.

[18] However, during both offenses, Hudgins repeatedly targeted public servants. Indeed, at Henton's home, Hudgins ran toward Officer Lyn with a knife. Even after Officer Lyn had tased Hudgins, which caused Hudgins to fall, Hudgins continued to reach under his body toward the knife. Then, after officers detained Hudgins, they called for medics to ensure that Hudgins did not sustain any injuries as a result of either of the falls or the taser. Once medics arrived, Hudgins became "very aggressive" and tried to bite them. Tr. Vol. II at 192. He then spat at the medics, and he threatened to kill the officers.

[19] Medics then transported Hudgins to the hospital where he continued to attack public servants. Indeed, Officer Lyn followed Hudgins to the hospital "for the safety of the medical crew." *Id*. at 193. At the hospital, Hudgins continued to target officers. Specifically, Hudgins kicked Deputy Winston twice, and he spat a mixture of saliva and blood at both Deputy Winton and Deputy Wesley. In other words, at both locations, Hudgins both spat at public servants and either threatened or committed acts of violence against officers. And all offenses happened within a short period of time on the same day.

[20] Because Hudgins spat on medics at Henton's home and on officers at the hospital, the State has established that a common *modus operandi* linked the two offenses. And because Hudgins repeatedly targeted public servants at both locations, the State has established that the same motive induced his criminal behavior. Accordingly, joinder of the two offenses was justified. *See Ennick*, 40 N.E.3d at 876.

[21] Moreover, while the State charged Hudgins with eleven offenses, one of which was dismissed prior to trial, the nature of those charges and the evidence presented were not overly complex. *See Grimes v. State*, 84 N.E.3d 635, 642 (Ind. Ct. App. 2017). Much of the evidence consisted of the officers' testimonies, which was straightforward and easy to understand. And Hudgins does not make any claim that the jury was unable to distinguish the evidence that applied to the hospital case from the evidence that applied to the house case. *See id*. For all of those reasons, we hold that the trial court did not abuse its discretion when it joined the two offenses for trial. We therefore affirm Hudgins' convictions.

[22] However, while we affirm Hudgins' convictions, we note that there is a discrepancy between the written sentencing order and the parties' recitations of Hudgins' convictions. The parties both describe Hudgins' conviction for domestic battery as a Class A misdemeanor, which is consistent with the jury verdicts and the court's oral judgment of conviction at the sentencing hearing. *See* Tr. Vol. III at 68. But the written sentencing order describes his conviction for that count as a Level 6 felony. *See* Appellant's App. Vol. II at 24. While the State had initially filed a notice of its intent to prove an enhancement that would elevate the domestic battery offense from a Class A misdemeanor to a Level 6 felony, the State ultimately informed the court that it would not pursue that enhancement. We therefore remand with instructions for the court to correct the written sentencing order to reflect Hudgins' domestic battery conviction as a Class A misdemeanor.

[23]     In sum, the trial court did not abuse its discretion when it granted the State's motion for joinder. As such, we affirm Hudgins' convictions, but we remand with instructions for the court to correct its written sentencing order.

[24]     Affirmed and remanded with instructions.


Bradford, C.J., and Mathias, J., concur.