

IN THE

# Court of Appeals of Indiana

Benjamin C. Taylor,

*Appellant-Defendant*



**FILED**

Jun 05 2024, 10:20 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

v.

State of Indiana,

*Appellee-Plaintiff*

---

June 5, 2024

Court of Appeals Case No.
23A-CR-1625

Appeal from the Jackson Circuit Court

The Honorable Chris D. Monroe, Senior Judge

Trial Court Cause No.
36C01-2007-F2-000020
36C01-2101-F6-000028

---

**Opinion by Judge Felix**
Chief Judge Altice and Judge Bradford concur.

**Felix, Judge.**

## Statement of the Case

[1] The day before Thanksgiving 2019, Benjamin Taylor stole Josefina Gonzalez-Quintana's vehicle from her driveway. The next day, he drove the stolen car to an apartment complex near Dustin and Brooklyn Reynolds's newly purchased home. There, Taylor broke and entered the home through a doggy-door, and prepared to steal several items and did steal other items. The State charged Taylor for these crimes under two separate cause numbers, which were later joined for trial. A jury convicted Taylor of two out of three charges, and the trial court sentenced him to a total of 45 years in the Indiana Department of Correction. Taylor now appeals and presents four issues for our review, which we revise and restate as the following three issues:

1. Whether the trial court abused its discretion by refusing to sever the two separate causes;
2. Whether the trial court abused its discretion in admitting certain evidence at trial; and
3. Whether the trial court erred in denying Taylor's motion to set aside the verdict.

[2] We affirm.

## Facts and Procedural History

[3] On the morning of November 27, 2019, in Seymour, Indiana, Gonzalez-Quintana started up her grey Chevrolet Malibu so it would be warm when she left for work. After starting the car, she went back inside her home. When

Gonzalez-Quintana came back outside, her car was missing; she did not see who took it. Gonzalez-Quintana reported the Malibu stolen that morning.

[4] The next day, November 28, 2019, Brooklyn and Dustin Reynolds left their recently purchased home in Seymour, Indiana early that morning and returned at approximately 11:00 or 11:30 a.m. After pulling into their driveway, Dustin opened the garage door using an automatic opener. As the garage door was going up, the Reynoldses noticed that the back door of the garage appeared to have been kicked open while they were away. The Reynoldses then got out of their truck, and as they were shutting the truck doors, a man walked out of their house and into their garage. Approximately three seconds after the Reynoldses first saw the man, he covered his face with a mask. With a foot-long screwdriver in one hand, he approached the driver side of the Reynoldses' truck where Dustin was standing and held the screwdriver in a "stabbing manner," Tr. Vol. III at 148, but did not strike Dustin. The man then walked away on foot. Brooklyn called 911.

[5] Once officers arrived and cleared the house, the Reynoldses began walking through their property with the officers. When they entered the house, they discovered a rug was rolled up in the middle of the living room with Brooklyn's laptop and a cord inside it. Brooklyn's keys were missing from their usual spot on the kitchen table. Some of the Reynoldses' moving boxes in the living room were also open and the contents of other containers were in disarray, but nothing else appeared to be missing.

[6] Outside of the back door to the garage, they discovered a black puffy jacket and car keys on a lanyard, none of which belonged to the Reynoldses. The car keys had a Chevrolet emblem. Seymour Police Department ("SPD") Officer Gilbert Carpenter collected the jacket and placed it in an evidence bag along with a pair of safety glasses and a lighter that had been on top of the jacket. At that time, Officer Carpenter did not feel any hard items within the jacket, so he did not go through the jacket's pockets.

[7] Officer Carpenter also collected the car keys, but instead of placing those in an evidence bag, he handed them to SPD Sergeant Ryan Huddleston. Sergeant Huddleston then had SPD Officer Derek Shelley drive around the area while pressing the alarm button on the key fob to locate the vehicle. While searching about two to three blocks away from the Reynoldses' house, a person approached Officer Shelley and asked if he was looking for a Chevrolet Malibu that was parked at an apartment complex. Officer Shelley learned the Chevrolet Malibu had been reported stolen and belonged to Gonzalez-Quintana. Officer Shelley was able to unlock the Malibu's driver side door with the car keys recovered from the Reynoldses' house. Officer Shelley did not enter the Malibu. Instead, he had it towed to the SPD for further investigation.

[8] Approximately 20 minutes after officers left the Reynoldses' house, the Reynoldses discovered that Dustin's work boots were missing and a pair of Puma tennis shoes had been left in the living room. Brooklyn called law enforcement, and Officer Carpenter returned and collected the shoes.

[9] Officer Carpenter relied on his body camera to video his investigation; he did not take any photographs with a separate camera. Due to an issue with SPD's computer server, Officer Carpenter's body camera video from his investigation of the incident at the Reynoldses' home was irretrievable.

[10] As part of the investigation, the jacket, safety glasses, Puma shoes, and swabs from the Malibu were sent to the Indiana State Police Laboratory (the "ISP Lab") for testing. In March 2020, the ISP Lab notified SPD Lieutenant C.J. Foster that DNA recovered from one of those items matched Taylor's DNA. Consequently, on May 19, 2020, Lieutenant Foster met with the Reynoldses at the SPD to show them photo arrays that included Taylor's picture. Brooklyn identified Taylor as the person she saw exiting her home and approaching Dustin on November 28, 2019. Dustin did not definitively identify Taylor but did state he looked familiar.

[11] On July 10, 2020, the State charged Taylor with burglary as a Level 2 felony[1] and armed robbery as a Level 3 felony[2] (the "Burglary Cause") in connection with the November 28, 2019, events at the Reynoldses' home. Ten days later, Lieutenant Foster obtained DNA from Taylor pursuant to a warrant, and he submitted that DNA to the ISP Lab for analysis and comparison to DNA present on the submitted items. Julie Mauer, a forensic DNA analyst with the

---

[1] Ind. Code §§ 35-43-2-1, 35-43-2-1(3)(A).

[2] *Id.* § 35-42-5-1(a)(2).

ISP Lab, determined that the majority of the DNA she found on the yellow glove, Puma shoes, and swabs from the Malibu belonged to Taylor.

[12] In January 2021, the State charged Taylor with auto theft as a Level 6 felony[3] (the "Auto Theft Cause") in connection with the November 27, 2019, theft of Gonzalez-Quintana's Malibu, under a different cause number. On July 15, 2021, the State filed a Motion for Joinder of Causes for Purposes of Trial (the "Joinder Motion"), requesting to have a single trial for the Auto Theft Cause and the Burglary Cause. Taylor filed an objection to the Joinder Motion. After a hearing, the trial court granted the Joinder Motion without entering findings or conclusions.

[13] A few weeks before trial, Officer Carpenter and Lieutenant Foster retrieved the black puffy jacket from evidence and laid it out for the parties to inspect in preparation for trial. At that time, a soft yellow glove was in the same evidence bag as the jacket. Officer Carpenter did not observe the yellow glove when he initially collected the jacket from the Reynoldses' property.

[14] On January 31, 2023, Taylor's jury trial began. The jury found Taylor guilty of burglary as a Level 2 felony and of auto theft as a Level 6 felony, but the jury found Taylor not guilty of armed robbery. The jury also found that Taylor was a habitual offender. On April 17, 2023—before his sentencing hearing—Taylor filed a motion to set aside the verdict based on allegedly false testimony from

---

[3] *Id.* §§ 35-43-4-2(a), (a)(1)(B)(ii).

SPD officers concerning the computer server crash that resulted in the loss of Officer Carpenter's body camera video. After a hearing, the trial court denied Taylor's motion. Thereafter, the trial court sentenced Taylor to a total aggregate sentence of 45 years executed at the Indiana Department of Correction. This appeal ensued.[4]

## Discussion and Decision

### 1. The Trial Court Did Not Err by Refusing to Sever the Auto Theft Cause from the Burglary Cause

[15] Taylor frames his argument that the trial court abused its discretion in granting the Joinder Motion. Once the trial court granted the Joinder Motion over Taylor's objection, proper procedure required him to file a motion for severance, which he did not do. *See Ennik v. State*, 40 N.E.3d 868, 875 (Ind. Ct. App. 2015) (citing Ind. Code § 35-34-1-12(a)), *trans. denied*; *Evans v. State*, 542 N.E.2d 546, 549 (Ind. 1989) (citing I.C. § 35-34-1-12(a); *Muse v. State*, 419 N.E.2d 1302, 1305 (Ind. 1981)). However, Taylor did "renew" his objection to the State's joinder motion at the beginning of trial for the sole purpose of "preserv[ing] any issues for appeal." Tr. Vol. II at 163. There is precedent for concluding that this issue is waived due to Taylor not making another objection

---

[4] We initially observe that Taylor fails to provide citations to the record for statements of fact in his Argument, which is a violation of Appellate Rule 46(A)(8)(a). Appellant's Br. at 22–23, 26–28, 32, 36–37, 39, 41. In further violation of Appellate Rule 46(A)(8)(a), Taylor fails to provide citations for statements of law in his Argument. Appellant's Br. at 40–41. However, Taylor's noncompliance with Appellate Rule 46 does not substantially impede our review of his claims, so we choose to address the merits thereof. *See Pierce v. State*, 29 N.E.3d 1258, 1267 (Ind. 2015).

or moving for severance during trial, *see* I.C. §§ 35-34-1-11(a), -12(a); *Ennik*, 40 N.E.3d at 875 (citing I.C. § 35-34-1-12(b)). Here, the State has not argued the issue is waived. Additionally, we believe that Taylor's opposition to the Joinder Motion as well as his renewed objection on the first day of trial is sufficient to have the issue reviewed on its merits. On the facts of this case, we deem Taylor's renewed objection to the Joinder Motion to be a motion for severance.

[16] When at least two offenses "have been joined for trial . . . on the ground that they are of the same or similar character, the defendant shall have a right to a severance of the offenses." I.C. § 35-34-1-11(a). Neither party here contends that the Burglary Cause and Auto Theft Cause were joined on the basis that they are of the same or similar character; therefore, severance is not a matter of right in this case. Taylor may still have been entitled to severance under Indiana Code section 35-34-1-11(a), which provides in relevant part that

> the court . . . shall grant a severance of offenses whenever the court determines that severance is appropriate to promote a fair determination of the defendant's guilt or innocence of each offense considering:
>
> (1) the number of offenses charged;
>
> (2) the complexity of the evidence to be offered; and
>
> (3) whether the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense.

Because Taylor was required to request a severance of the joined offenses, we conclude that the issue is more properly framed as whether the trial court should have granted the request to sever. We review a trial court's refusal to sever charges under these circumstances for an abuse of discretion. *Craig v. State*, 730 N.E.2d 1262, 1265 (Ind. 2000) (citing *Kahlenbeck v. State*, 719 N.E.2d 1213, 1216 (Ind. 1999)).

[17] This case involved three charges. The evidence primarily consisted of the testimony of the three victims and the law enforcement officers who investigated the crimes. Taylor has not demonstrated that the evidence was complex or that the jury would have had difficulty distinguishing the evidence and applying the law intelligently to each count. Therefore, we cannot say the trial court abused its discretion in refusing to sever the Burglary Cause from the Auto Theft Cause.

## 2. The Trial Court Did Not Abuse Its Discretion by Admitting the Yellow Glove and Testimony Regarding Pre-Trial Identifications

[18] Taylor argues that the trial court abused its discretion in admitting certain evidence at trial. "The trial court has broad discretion to rule on the admissibility of evidence." *Thomas v. State*, 81 N.E.3d 621, 624 (Ind. 2017). We review evidentiary rulings for an abuse of discretion, which occurs when the ruling is "clearly against the logic and effect of the facts and circumstances." *Blount v. State*, 22 N.E.3d 559, 564 (Ind. 2014) (citing *Turner v. State*, 953 N.E.2d 1039, 1045 (Ind. 2011)). Moreover, we may affirm an evidentiary ruling on any

theory supported by the evidence. *Satterfield v. State*, 33 N.E.3d 344, 352 (Ind. 2015).

[19] In particular, Taylor argues the trial court abused its discretion when it admitted (a) the yellow glove, and (b) evidence regarding pre-trial identifications of Taylor. We address each argument in turn.

### a. Yellow Glove

[20] Taylor first challenges the trial court's admission of the yellow glove at trial; specifically, Taylor argues the yellow glove lacked a sufficient chain of custody. Taylor does not challenge the yellow glove's chain of custody after it arrived at the ISP Lab, so we limit our review accordingly.[5] We also observe that the record is devoid of any information regarding the nature of Taylor's objection to admission of the yellow glove at trial.[6]

---

[5] Pursuant to Indiana Appellate Rule 46(A)(8)(d), Taylor must cite "to the pages of the Transcript where the evidence was identified, offered, and received or rejected." Taylor does not cite the pages of the Transcript where the State offered and the trial court admitted the yellow glove into evidence at trial. *See* Appellant's Br. at 29–32. We remind counsel that the purpose of our appellate rules—especially Appellate Rule 46 governing the content of briefs—"is to aid and expedite review and *to relieve the appellate court of the burden of searching the record and briefing the case.*" *Miller v. Patel*, 212 N.E.3d 639, 657 (Ind. 2023) (emphasis added) (quoting *Dridi v. Cole Kline LLC*, 172 N.E.3d 361, 364 (Ind. Ct. App. 2021)).

[6] Taylor cites to page 169 of Volume III of the Transcript for the proposition that he "made a contemporaneous objection at trial." Appellant's Br. at 31. A review of that page of the Transcript reveals that the State was questioning Officer Carpenter about the parties' pre-trial examination of the physical evidence when Taylor objected and a bench conference occurred. There is no transcription of the bench conference. We do not know if Taylor objected to the yellow glove and if so, on what grounds. However, on appeal, the State does not claim Taylor waived this issue for our review by failing to raise a proper objection at trial, *see* Appellee's Br. at 38–40, so we address the merits of Taylor's claim.

[21] When offering evidence, the State "need only provide 'reasonable assurance' that the evidence passed through various hands in an undisturbed condition, and need only provide evidence that 'strongly suggests' the exact whereabouts of the evidence at all times." *Kennedy v. State*, 578 N.E.2d 633, 639 (Ind. 1991) (quoting *Russell v. State*, 489 N.E.2d 955, 957 (Ind. 1986)). That is, "the State need not establish a perfect chain of custody, and any gaps go to the weight of the evidence and not its admissibility." *Speers v. State*, 999 N.E.2d 850, 855 (Ind. 2013) (quoting *Kennedy*, 578 N.E.2d at 639). To successfully challenge the chain of custody established by the State, the defendant must present evidence that raises more than a "mere possibility that the evidence could have been tampered with or that a substitution or alteration could have been made." *Kennedy*, 578 N.E.2d at 639 (quoting *Gambill v. State*, 479 N.E.2d 523, 529 (Ind. 1985)); *Troxell v. State*, 778 N.E.2d 811, 814 (Ind. 2002) (citing *Cliver v. State*, 666 N.E.2d 59, 63 (Ind. 1996)).

[22] "The extent of foundation the State must lay depends on whether the item to be admitted is fungible or nonfungible." *K.W. v. State*, 216 N.E.3d 505, 516 (Ind. Ct. App. 2023) (citing *Dudley v. State*, 480 N.E.2d 881, 898 (Ind. 1985)), *trans. denied*, 228 N.E.3d 1019 (Ind. 2024). The yellow glove is clearly a "nonfungible item." *See K.W.*, 216 N.E.3d at 516 (quoting *Mateo v. State*, 981 N.E.2d 59, 67 (Ind. Ct. App. 2012)) (explaining "fungible items" include "blood and drugs" and "nonfungible items" include "guns and vehicles"); *Lucas v. State*, 413 N.E.2d 578, 582 (Ind. 1980) (concluding blood spots on clothing did not convert that clothing from "nonfungible items" to "fungible items"). "[F]or

'nonfungible items, the State need only show that the item is what it is purported to be and that it is in a substantially unchanged state' from when it was initially collected by police." *K.W.*, 216 N.E.3d at 516 (quoting *Mateo*, 981 N.E.2d at 67); *see also Scherer v. State*, 563 N.E.2d 584, 586 (Ind. 1990) (citing *Dudley v. State*, 480 N.E.2d 881 (Ind. 1985), *cert. denied*, 490 U.S. 1011 (1989)). If the nonfungible item "passed through numerous hands, the State does not need to exclude all possibility of tampering but instead must provide reasonable assurance that the evidence remained in an undisturbed condition." *Scherer*, 563 N.E.2d at 586 (citing *Simmons v. State*, 504 N.E.2d 575 (Ind. 1987)). We also presume that officers exercise due care in handling their duties. *Troxell*, 778 N.E.2d at 814.

[23] Here, Officer Carpenter testified that he did not observe the yellow glove when he initially collected the jacket from the Reynoldses' property but that he did not check the jacket's pockets because a general pat-down of it revealed there were no hard objects within. Officer Carpenter placed the black jacket in a paper bag that he sealed and that was kept in SPD's secure evidence locker until it was transported to the ISP Lab for testing. When Mauer opened that sealed bag at the ISP Lab—which was documented as only containing the black jacket—the yellow glove was in it as well.

[24] On these facts, the State provided evidence that strongly suggested the exact whereabouts of the yellow glove at all times—namely, in the sealed bag containing the black jacket—and that it was not disturbed when it passed from the SPD to the ISP Lab. Therefore, we cannot say that the trial court abused its

discretion by admitting the yellow glove into evidence at trial. Any lack of chain-of-custody goes to weight, not admissibility.

### b. Pre-Trial Identifications

[25] Taylor next challenges the admission of "the Reynolds identification evidence." Appellant's Br. at 36. In the absence of Taylor specifying exactly what testimony or exhibits make up "the Reynolds identification evidence," we limit our review of the admission of Exhibits 7, 18, 19, 28, and 29.[7]

[26] Exhibit 7 was the photo array Lieutenant Foster showed to Brooklyn on May 19, 2020, and from which she identified Taylor as the man she saw at her home on November 28, 2019. Exhibits 18 and 19 are lists of the identities of the individuals' photos the SPD used in the photo arrays shown to the Reynoldses. Exhibits 28 and 29 are higher quality reproductions of the photo arrays Lieutenant Foster showed to the Reynoldses on May 19, 2020.

---

[7] Taylor does not expressly state which evidence he believes the trial court erroneously admitted. However, in support of his statement that he "made a contemporaneous objection to the identification information at trial," Taylor cites several pages of the Transcript. Appellant's Br. at 34 (citing Tr. Vol. III at 75–76, 128; Tr. Vol. IV at 63, 65, 117). Those particular pages show that Taylor objected to Exhibits 7, 18, 19, 28, and 29, but there is no indication about what Taylor's bases were for those objections because the bench conferences—during which we presume Taylor set forth the reasons for his objections—are not transcribed. Again, the State does not argue that Taylor failed to properly object to the admission of Exhibits 7, 18, 19, 28, and 29 at trial, so we address the merits of Taylor's claim.

Additionally, in violation of Appellate Rule 46(A)(8)(d), Taylor does not cite the pages of the Transcript where Exhibits 18, 19, 28, and 29 were identified or where the State offered and the trial court admitted Exhibits 28 and 29. We remind counsel that this court should not have to search the record to find a basis for a party's argument. *Carter ex rel. CNO Fin. Grp., Inc. v. Hilliard*, 970 N.E.2d 735, 755 (Ind. Ct. App. 2012) (citing *Nealy v. Am. Family Mut. Ins.*, 910 N.E.2d 842, 845 n.2 (Ind. Ct. App. 2009), *trans. denied*).

Taylor specifically argues that the photo arrays Lieutenant Foster showed to the Reynoldses on May 19, 2020, were impermissibly suggestive. As our Supreme Court has explained:

> The Due Process Clause of the Fourteenth Amendment requires suppression of testimony concerning a pre-trial identification when the procedure employed is impermissibly suggestive. *Harris v. State*, 716 N.E.2d 406, 410 (Ind. 1999); *Parker v. State*, 698 N.E.2d 737, 740 (Ind. 1998); *James v. State*, 613 N.E.2d 15, 27 (Ind. 1993). A photographic array is impermissibly suggestive if it raises a substantial likelihood of misidentification given the totality of the circumstances. *Harris*, 716 N.E.2d at 410.
>
> A trial court considers certain factors to evaluate the likelihood of a misidentification: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; and (4) the level of certainty demonstrated by the witness. *James*, 613 N.E.2d at 27.

*Williams v. State*, 774 N.E.2d 889, 890 (Ind. 2002). A court may also consider "(1) the manner and form in which the police asked the witness to identify the suspect and the witness's interpretation of their directives and (2) whether the police focused on the defendant as the prime suspect, either by their attitude or the makeup of the photo array." *Parker*, 698 N.E.2d at 740 (citing *Bell v. State*, 622 N.E.2d 450, 454 (Ind. 1993), *overruled on other grounds by Jaramillo v. State*, 823 N.E.2d 1187 (Ind. 2005); *Brooks v. State*, 560 N.E.2d 49, 55 (Ind. 1990)).

When the Reynoldses returned to their house in the late morning of November 28, 2019, they watched Taylor emerge from their home and look directly at

them with his face uncovered. It was not until approximately three seconds later that the burglar covered his face. From the time Taylor exited the home to the time he walked away from the Reynoldses, he was always within three to four yards of them, and they watched him the entire time. When Officer Carpenter spoke with the Reynoldses on November 28, 2019, Dustin described the burglar as having dark shaggy hair and wearing a black coat, and Brooklyn described the burglar as having brown hair and brown eyes and wearing a large black coat. The Reynoldses also told Officer Carpenter that the burglar was probably about five feet and six inches tall.

[29] Approximately six months later on May 19, 2020, Lieutenant Foster met with the Reynoldses at the SPD to show them photo arrays that included Taylor's picture. Lieutenant Foster created two different photo arrays—one to show Brooklyn and one to show Dustin. Both photo arrays used the same six black-and-white photos, but the photos were in different positions on each array. The five individuals who were included alongside Taylor in the photo array substantially resemble Taylor, including their hair cut, facial hair, and face shape.

[30] Lieutenant Foster showed the Reynoldses the photo arrays separately. Lieutenant Foster first brought Brooklyn to an interview room by herself, closed the door, and gave her a set of instructions. Those instructions included telling Brooklyn that she "shouldn't conclude that the photos contain someone that committed a crime," "shouldn't conclude that all people in the photographs are criminals," was "not obligated to identify somebody if [she] can't or do[es] not

want to," "it's important to free innocent people as it [is] to identify guilty parties," she should "take into consideration that [a photo] may not depict what the individual looks like at the present time." Tr. Vol. III at 62. Brooklyn identified the person whose photo appeared in the number six slot—Taylor—as the burglar, and she circled that photo and signed and dated the array. Lieutenant Foster then had Brooklyn leave the room and brought in Dustin, closed the door, and gave him the same set of instructions. Dustin stated the person whose photo appeared in the number two slot—Taylor—was "familiar" but did not unequivocally identify that person as the burglar. Dustin circled that photo; wrote "He looks familiar," above it; and signed and dated the array. Tr. Vol. VI at 164, 196.

[31] Given the totality of these circumstances, there was not a substantial likelihood that the Reynoldses misidentified Taylor when they picked him out of the photo arrays; that is, the photo arrays and procedure used here were not impermissibly suggestive. Therefore, the trial court did not abuse its discretion when it admitted Exhibits 7, 18, 19, 28, and 29.

### 3. The Trial Court Did Not Err by Denying Taylor's Motion to Set Aside the Verdict

[32] Taylor claims the trial court erred in denying his motion to set aside the verdict because the State violated his due process rights under the Fourteenth Amendment to the United States Constitution. Because constitutional claims raise questions of law, we review such claims de novo. *Tiplick v. State*, 43 N.E.3d 1259, 1262 (Ind. 2015) (citing *Dep't of State Revenue v. Caterpillar, Inc.*, 15

N.E.3d 579, 587 (Ind. 2014)). Taylor specifically argues that he was denied due process because (a) the State allegedly destroyed or otherwise failed to preserve exculpatory video evidence and (b) the State allegedly solicited false or misleading testimony regarding the loss of that video evidence. We address each argument in turn.

### a. Destruction of or Failure to Preserve Officer Carpenter's Body Camera Video

[33] Taylor first argues that the loss of Officer Carpenter's body camera footage prior to trial is a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Under *Brady*, a prosecutor's "suppression of evidence favorable to the accused that is material either to guilt or punishment violates the Due Process Clause." *Church v. State*, 189 N.E.3d 580, 592 (Ind. 2022) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). "Evidence is material when there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *State v. Hollin*, 970 N.E.2d 147, 153 (Ind. 2012) (citing *Minnick v. State*, 698 N.E.2d 745, 755 (Ind. 1998)). However, "*Brady* has no application . . . where the alleged exculpatory evidence no longer exists but its content was nonetheless revealed through testimony at trial." *Albrecht v. State*, 737 N.E.2d 719, 724 n.2 (Ind. 2000) (quoting *Noojin v. State*, 730 N.E.2d 672, 676 n.1 (Ind. 2000)).

[34] For example, in *Noojin v. State*, a draft of a witness's statement to law enforcement was destroyed prior to trial, but both the witness and the detective who took his statement testified at trial about the content of the witness's

statement. 730 N.E.2d at 675. Similarly, in *Albrecht v. State*, FBI agent Daniel Craft's witness interview notes were negligently destroyed before trial, but Craft testified about the notes' existence and content at trial, 737 N.E.2d at 723–24; there was also no evidence the State suppressed the notes, *id.* at 724 n.2. In both cases, the Indiana Supreme Court determined that *Brady* did not apply to the destroyed evidence because the contents of that evidence were revealed at trial through testimony. *Noojin*, 730 N.E.2d at 676 n.1 (citing *Williams v. State*, 714 N.E.2d 644, 649 (Ind. 1999)); *Albrecht*, 737 N.E.2d at 724 n.2 (citing *Noojin*, 730 N.E.2d at 676 n.1).

[35] Here, Officer Carpenter's body camera footage no longer existed, but he testified about its contents at trial. Officer Carpenter testified about his investigation of the burglary and collection of evidence. The Reynoldses' testimony about the investigation was substantially similar to Officer Carpenter's testimony on the subject. Pursuant to our Supreme Court's decisions in *Noojin* and *Albrecht*, *Brady* does not apply to the loss of Officer Carpenter's body camera video. *See Noojin*, 730 N.E.2d at 676 n.1. We therefore analyze Taylor's due process challenge to the loss of the video under *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988) and *California v. Trombetta*, 467 U.S. 479, 489 (1984).

[36] The State's destruction of or failure to preserve potentially useful evidence—as opposed to materially exculpatory evidence—does not constitute a denial of due process "unless a criminal defendant can show *bad faith* on the part of" law enforcement. *Youngblood*, 488 U.S. at 58 (emphasis added). Therefore, we

must first determine whether the evidence in question was "potentially useful evidence" or "materially exculpatory evidence." *Id.* at 57. "Potentially useful evidence" is evidence about "which no more can be said than that it could have been subjected to tests, the results of which *might* have exonerated the defendant." *Id.* (emphasis added). "Materially exculpatory evidence" is evidence that "possesses an exculpatory value that was apparent before the evidence was destroyed" and must "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489. Although a defendant is not required to conclusively prove the destroyed evidence was materially exculpatory, "there must be some indication that the evidence was exculpatory." *Johnson v. State*, 507 N.E.2d 980, 983 (Ind. 1987) (citing *Wilson v. State*, 432 N.E.2d 30, 32 (Ind. 1982)). "[W]e cannot assume that the destroyed evidence contained exculpatory material when the record is devoid of such indication." *Id.* (citing *Wilson*, 432 N.E.2d at 32).

[37]  Taylor provides nothing more than speculation about the possible exculpatory value of Officer Carpenter's body camera footage. Taylor implies that the video may have shown that Officer Carpenter improperly handled evidence, but he does not point to any part of the record that indicates mishandling of evidence may have occurred here. On this record, we cannot say that Officer Carpenter's body camera video had exculpatory value that was apparent before it was lost. Moreover, Officer Carpenter and the Reynoldses testified about the collection of evidence from the Reynoldses' house, which is comparable evidence to the

video. Under these circumstances, the video is "potentially useful evidence," not "materially exculpatory evidence." As such, we now turn to whether destruction of Officer Carpenter's body camera footage was the result of bad faith on the part of law enforcement.

[38] Taylor makes no argument on appeal that the loss of the body camera video here resulted from law enforcement's bad faith. Thus, Taylor has not carried his burden of showing bad faith on the part of law enforcement. *See Youngblood*, 488 U.S. at 58. Because Officer Carpenter's body camera footage of the investigation was only potentially useful evidence and Taylor has not demonstrated that its loss was the result of bad faith on the part of law enforcement, Taylor's due process rights were not violated under the Fourteenth Amendment to the United States Constitution. Therefore, the trial court did not err by denying Taylor's motion to set aside the verdict on this basis.

### b. *Solicitation of False or Misleading Testimony at Trial Concerning the Loss of Officer Carpenter's Body Camera Video*

[39] Next, Taylor alleges that the State, through Officer Carpenter and Lieutenant Foster, presented false testimony to obtain his conviction in violation of *Napue v. Illinois*, 360 U.S. 264 (1959). "It is well established that 'a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.'" *Smith v. State*, 34 N.E.3d 1211, 1219 (Ind. 2015)

(quoting *Napue*, 360 U.S. at 269). That is, "a defendant's Fourteenth Amendment due process rights are violated when the prosecution *knowingly* uses false testimony without disclosing its falsity or attempting to correct it. *Id.* (emphasis added) (citing *Alcorta v. Texas*, 355 U.S. 28, 31–32 (1957); *Miller v. Pate*, 386 U.S. 1, 6–7 (1967)).

[40]  Taylor specifically alleges that the State solicited false testimony from Officer Carpenter and Lieutenant Foster concerning the loss of Officer Carpenter's body camera video of his investigation of the burglary of the Reynoldses' home. In a deposition taken October 8, 2021, Officer Carpenter testified that his body camera video was "gone" because "[t]here was an issue with our server and our server crashed." Appellant's App. Vol. IV at 206. A few months later at the hearing on Taylor's motion to suppress, Officer Carpenter testified that his body camera footage was "gone" because "the server that keeps those videos had crashed" and "we were told that it had acted up and crashed the system and there was [sic] several videos for several cases that had been lost, or they're misplaced, or they've scrambled the video and it was irretrievable." Tr. Vol. II at 52; *see also id.* at 62. Lieutenant Foster testified that

> the server became inoperable, frozen if you will where you couldn't do anything with – with the computer systems itself and at the time Assistant Chief Craig Hayes went in to attempt to fix the issue and I believe at one point he conducted what they call a hard shutdown of the computer system which is basically flipping the off switch and when the system was turned back on that's when everything was either lost or scrambled or not legible.

*Id.* at 66. Lieutenant Foster further testified that the SPD had been unsuccessful in its attempts to recover the lost and scrambled data. *Id.* at 66–67.

[41] At trial, Officer Carpenter testified that his body camera video was lost because the SPD "had a large server crash just shortly *after*" the November 28, 2019, burglary of the Reynoldses' house. Tr. Vol. III at 158 (emphasis added). Officer Carpenter testified that a majority of SPD's body camera footage "was lost" and "all scrambled up." *Id.* at 160. The following exchange occurred when Taylor cross-examined Officer Carpenter about the server crash:

> Q. [Y]ou said that video downloaded to a Seymour Police Department server, is that correct?
>
> A. Yes.
>
> Q. And law enforcement had exclusive control and possession over that server, is that correct?
>
> A. Yes. Administration would have had control of that. The only control that I have is being able to review the video.
>
> Q. Okay. And actually, the server was physically turned off by the Seymour Police Department is that correct?
>
> A. That I don't know.
>
> Q. Okay, you don't . . . know whether it crashed or somebody actually flipped a switch and turned it off?

A. I – I have no idea, I just know that they said the server had crashed and they lost a lot of information.

*Id.* at 196. Similarly, Lieutenant Foster testified at trial that he did not "know if the server crashed" but he did know "there was [sic] issues with the server and it was turned off in an attempt to reboot it . . . and something was wrong with the server." Tr. Vol. IV at 74. Lieutenant Foster further testified that Assistant Chief Hayes "[p]erformed a hard shut down" of the server, *id.* at 96, and that the SPD had "exclusive possession" of the server, *id.* at 74–75.

[42] On February 8, 2023—just five days after the jury convicted Taylor of burglary and auto theft—SPD Chief Greg O'Brien notified the prosecutor via a letter that the server crash about which Officer Carpenter and Lieutenant Foster testified actually occurred in early 2018. According to Chief O'Brien, Officer Carpenter's testimony that the server crashed after November 28, 2019, was based on erroneous information provided to him by SPD Information Technology Manager Ernie Davidson. Chief O'Brien explained that it was his "opinion that Officer Gilbert Carpenter did miss lead [sic] the court about a server crash, but he didn't lie to the court, as he was only going on the information he was provided." Appellant's App. Vol. IV at 41. The State promptly notified Taylor of this information, and post-verdict discovery ensued.

[43] In a deposition taken March 8, 2023, Chief O'Brien testified that in talking to Lieutenant Foster about Taylor's trial, he realized Lieutenant Foster and Officer Carpenter may have provided incorrect information about the loss of Officer Carpenter's body camera video. In his subsequent investigation into the

details of the server crash, Chief O'Brien determined that the server crash happened sometime in early 2018. When Chief O'Brien attempted to retrieve the logs from the server hosting the body camera videos, he discovered that there were no logs for any SPD officer from November 11, 2019, to November 29, 2019, but he could not definitively determine the cause of this gap. Chief O'Brien also testified that only two people had access to the server: Davidson and Assistant Chief Hayes.

[44] In another deposition, Davidson testified that the server crashed not in early 2018 but sometime before June 18, 2018 and that he mistakenly gave Officer Carpenter incorrect dates for the server crash shortly before Officer Carpenter testified at trial. Davidson was also unable to retrieve logs for the body camera system for November 11, 2019, to November 29, 2019. Additionally, in a deposition taken of Lieutenant Foster, he testified that his testimony at trial and the motion to suppress hearing was "not accurate" and was "[b]ased on what [he] understood from Officer Carpenter." Appellant's App. Vol. IV at 45.

[45] Carpenter was also deposed. He testified that he did not learn until after trial that the server crash occurred in 2018 instead of late 2019. Officer Carpenter testified he downloaded his body camera video from the burglary investigation, and he was able to view that footage while he wrote his report thereon. However, the server ultimately did not retain that video or the video otherwise became unretrievable. According to Officer Carpenter, he searched for the lost footage sometime before his deposition in late 2021, but he did not recall discussing his lost body camera video or the server crash with Davidson until

January 2023, at which time Davidson mistakenly gave Officer Carpenter incorrect information about the date of the server crash. Officer Carpenter also testified that he did not have the ability to edit or delete his body camera footage.

[46] Based on the foregoing, it is clear that Officer Carpenter and Lieutenant Foster provided inaccurate testimony only about the timing of the server crash. There was a crash. The videos were lost, damaged, or otherwise irretrievable. There is no indication in the record that the prosecutor knew the testimony about the timing of the crash was incorrect until after the jury convicted Taylor. In fact, in his motion to set aside the verdict, Taylor concedes that "the Jackson County Prosecutor's Office did not knowingly present false evidence." Appellant's App. Vol. IV at 21. Because the State did not solicit false testimony or knowingly use false testimony without correcting it, Taylor's due process rights under the Fourteenth Amendment to the United States Constitution were not violated. Thus, the trial court did not err by denying Taylor's motion to set aside the verdict on this basis.

## Conclusion

[47] In sum, the trial court did not abuse its discretion by refusing to sever the Auto Theft Cause and the Burglary Cause, the trial court did not abuse its discretion by admitting the yellow glove and exhibits relating to the Reynoldses' pre-trial identification of Taylor, and the trial court did not err in denying Taylor's motion to set aside the verdict because Taylor's due process rights were not violated due to the SPD's failure to preserve Officer Carpenter's body camera

video or due to Officer Carpenter's and Lieutenant Foster's incorrect testimony about the server crash. We therefore affirm the trial court on all issues raised.

[48] Affirmed.

Altice, C.J., and Bradford, J., concur.

ATTORNEY FOR APPELLANT

R. Patrick Magrath
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Ian A. McLean
Supervising Deputy Attorney General
Indianapolis, Indiana