


FILED

Mar 18 2026, 9:02 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

Demarcus Solvontez Davis,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

---

March 18, 2026

Court of Appeals Case No.
25A-CR-622

Appeal from the Madison Circuit Court

The Honorable Angela Warner Sims, Judge

Trial Court Cause No.
48C01-2307-MR-2161

---

**Opinion by Judge Mathias**
Judges Vaidik and Pyle concur.

**Mathias, Judge.**

[1] Demarcus Davis appeals his convictions for murder and Level 3 felony robbery as well as his resulting sentence.[1] Davis raises five issues for our review, which we reorder and restate as follows:

> 1. Whether the trial court erred when it granted the State's motion to join Davis and his codefendant for trial.
>
> 2. Whether Davis can demonstrate that the trial court erred in denying his objection to the State's use of a peremptory challenge.
>
> 3. Whether the prosecutor committed fundamental error in her closing remarks to the jury.
>
> 4. Whether the State presented sufficient evidence to support Davis's convictions.
>
> 5. Whether Davis's ninety-six-year aggregate sentence is inappropriate in light of the nature of the offenses and his character.

[2] We clarify that an objection to the State's motion for joinder under Indiana Code section 35-34-1-9 is, by itself, sufficient to preserve the trial court's joinder decision for appellate review. We also clarify that, to demonstrate reversible error in the trial court's joinder decision, an appellant must show both that the

---

[1] Davis does not specifically appeal his adjudication as a habitual offender.

trial court abused its discretion in granting the motion and also that the error mattered to the trial outcome. In light of those clarifications, we affirm Davis's convictions and sentence.

## Facts and Procedural History

Davis and Roger Rodriguez, Jr.[2] have been friends since 2020. In June 2023, Rodriguez lived in an upstairs room at a home owned by his second cousin, Mary Vasquez, on 13th Street in Anderson. On June 22, Rodriguez and Davis exchanged messages in which they both lamented their need "to get some money." Tr. Vol. 4, p. 248.

Five days later, Rodriguez met with a friend named Derrick, and the two played "[c]ards and dominos" on Vasquez's front porch. Tr. Vol. 3, p. 31. Derrick noticed that Rodriguez was on his phone frequently. Around 7:11 p.m., Rodriguez texted Davis "[t]hirty thousand," followed by, "[b]ring the strap." Tr. Vol. 4, p. 249. Davis responded: "Let me pop out on him." *Id.* at 250. An investigating officer later testified that those messages were "indicative of a robbery being set up." Tr. Vol. 5, p. 10.

Shortly after Davis's response, Tim Kates arrived at Vasquez's residence in a large black vehicle. Rodriguez texted Davis, "[h]e here." Tr. Vol. 4, p. 250. Davis immediately responded: "On my way!" *Id.*

---

[2] Rodriguez was Davis's codefendant. His appeal is before our Court in case number 25A-CR-623.

[6]     Kates exited his vehicle with a black pouch ("like a child's pencil bag for school"). Tr. Vol. 3, p. 190. Kates, Rodriguez, and Derrick chatted for a few minutes, and then Davis arrived. Rodriguez went out to meet Davis at Davis's vehicle; as he did so, Kates took some money out of the black pouch and put it in his pockets. Rodriguez and Davis then arrived on the front porch, and Davis and Kates then went inside Vasquez's residence together. Rodriguez joined them inside the residence about one minute later.

[7]     About two minutes after that, Davis exited the residence, went to his vehicle for a moment, and then went back inside the residence. Before the front door had closed behind him, Derrick, who was still on the front porch, heard at least six "[r]apid" gunshots "[g]rouped together." *Id.* at 39, 193. Derrick immediately fled. Davis exited the residence a few seconds later. As he exited, he was holding a handgun, and his pockets were stuffed with money. Rodriguez exited a few seconds after Davis; as he did so, he was holding "a handful of money" that he was "shoving" into his pocket, and he "picked up a bill" that Davis had dropped. *Id.* at 197-98.

[8]     Davis promptly left the scene in his own vehicle. Rodriguez, meanwhile, stayed on the front porch for about an hour. He then went to Kates's vehicle, removed a tote and a rifle, and then "wip[ed] the doors and door handles" with his clothing. *Id.* at 199. Rodriguez placed the tote and rifle inside the residence and then returned to the front porch, where he started "counting [the] cash." *Id.* at 201.

[9] Late that evening, Vasquez received a call that the front door to her residence was sitting open. Vasquez went to the residence, and, upon entering it, she observed Kates's body. He had been shot six times and had died as a result of his wounds; he likely died several minutes after he had been shot, and all of the bullets entered his body from either the back or the side. Vasquez's daughter called local law enforcement.

[10] Investigating officers located ten spent 9mm shell casings inside the residence. Eight were found on the opposite side of the room from Kates's body; one was lying near his body; and one ended up in an adjacent room near the other eight casings. *See* Ex. Vol. 1, p. 44. Seven of the shell casings were for Federal-brand bullets; those seven bullets had been fired from the same firearm. Officers also observed a 9mm handgun lying near Kates's body; none of the bullets recovered from the scene had been fired from that handgun. Kates's black pouch was empty, but he had some cash in his clothing.

[11] Officers also learned that Vasquez had four security cameras around the residence, one for each side. The officers seized that equipment and identified Davis and Rodriguez as suspects. Indiana officers apprehended Rodriguez in mid-July, and Mississippi officers apprehended Davis shortly thereafter.

[12] The State ultimately charged both Davis and Rodriguez with the same offenses: murder, felony murder, Level 3 felony robbery, and for being habitual offenders. The State then requested the court to join Davis and Rodriguez in the

same information[3] in accordance with, in relevant part, Indiana Code section 35-34-1-9(b)(1) (2022), which provides that two or more defendants can be joined in the same information when each defendant is charged with each offense included. Davis and Rodriguez both objected to being joined. Davis, in particular, objected on the ground that there was a "strong likelihood" that he and Rodriguez would have "conflicting interests at trial," citing the potential for finger-pointing and "hearsay statements . . . one of the co-defendants made . . . ." Tr. Vol. 1, p. 30. The trial court overruled Davis's and Rodriguez's objections. Thereafter, neither Davis nor Rodriguez filed a pretrial motion for a separate trial, and they did not request separate trials upon the commencement of their joint trial or afterward.

[13] The trial court held their joint trial in January 2025. During jury selection, the State used a peremptory challenge to strike Prospective Juror 67, an African-American. Davis objected and argued that the State's use of its peremptory challenge violated his equal protection rights under *Batson v. Kentucky*, 476 U.S. 79 (1986). The State responded that it had at least four race-neutral reasons for striking Prospective Juror 67: (1) he said he "would feel responsible for sending someone away" and that it "would possibly influence his judgement [sic]"; (2) he said that, "if [the defendant] didn't pull the trigger, [he] should be guilty of a lesser charge"; (3) he left multiple answers blank on the jury questionnaire; and (4) the State's background check of the juror showed that he had "multiple

---

[3] The State filed its motion to amend the information to join the defendants after the omnibus date.

family members that had been convicted of crimes," which the juror did not disclose. Tr. Vol. 2, pp. 16-17. Following the State's recitation of its race-neutral reasons, Davis suggested that other prospective jurors also expressed concern about the responsibility of being a juror, but he did not address the State's other stated reasons. The trial court overruled Davis's *Batson* objection.

[14] During the State's case-in-chief, Vasquez, Derrick, and investigating officers testified. The State also had Vasquez's home surveillance videos from the time of Kates's murder admitted into evidence. Davis and Rodriguez did not present any evidence in their own defenses, yet they received a self-defense instruction and argued to the jury that Kates's apparent possession of a handgun may have supported a justified shooting.

[15] On rebuttal, the prosecutor responded to the self-defense theory as follows:

> I want you to consider if the actions of these two (2) men after they killed Timothy Kates are consistent with people who acted in self-defense. . . . [D]id, they call the police? Did they call the police when this happened and said, "Oh my God this is some big misunderstanding I was just going to by [sic] something from him and he pulled a gun on me." "It was a big mistake." Did they do that, no. Did they tell the neighbor? Did Roger Rodriguez tell the neighbor the four (4) times he talked to him after the crime, no. Did they leave Tim Kates['s] personal belongings, no. They took all the cash they could see, and they went and dug through his truck. Are those the actions of men who act in self-defense? Roger Rodriguez was so cold and callus [sic] that he sat around while this man was dying on his floor and counted out the money that he just took from his dead cold hands essentially and kept stealing when he went to his truck. If you recall the point in the video where several times Roger

Rodriguez opened the front door and just kind [of] peeked in and was like, "Oh shit[,] I don't know what to do" [and] that's probably what's going through his head, right. And the one time he opens the door or looks in the door and something really scared him because he jumped off the porch [and] ran down around the side of the house; this was about five (5) minutes after Tim Kates had been shot. Doctor Watkins said it would've taken minutes for him to die. Roger Rodriguez was probably listening to Tim Kates taking his last breaths and gurgling and heard that and ran out the door. Is that the action of men who acted in self-defense?

Tr. Vol. 5, pp. 87-89. Davis did not object to the prosecutor's statements on rebuttal. The jury found Davis guilty, in relevant part, of murder and Level 3 felony robbery, and Davis then admitted to being a habitual offender.

[16] At an ensuing sentencing hearing, Davis argued that his admission to being a habitual offender was a significant mitigating circumstance. The trial court disagreed and found that Davis's admission was simply pragmatic following a five-day jury trial that had ended unfavorably for him. With respect to aggravating circumstances, the court found the following: (1) Davis's "extensive" criminal history, where "[t]he only gaps" appeared to be while Davis "was either under some form of court supervision or incarcerated"; (2) Davis was under an order of court supervision at the time of the instant offenses; (3) the nature and circumstances of the offenses, in particular the "multiple shots that the victim sustained"; (4) Davis's post-shooting "evasive actions to avoid law enforcement," most notably "fleeing the State of Indiana"; (5) Davis had another outstanding warrant for his arrest; and (6) the poor

quality of Davis's character. *Id.* at 150-52. The court then ordered Davis to serve an aggregate term of ninety-six years in the Department of Correction.

[17] This appeal ensued.

## 1. Davis's objection to the State's motion for joinder is properly before us, but he has not demonstrated either error or prejudice in the trial court's decision to grant the State's motion.

[18] On appeal, Davis first argues that he was entitled to have a separate trial from Rodriguez. We initially note that Davis's argument here conflates joinder under Indiana Code section 35-34-1-9 with severance under Indiana Code sections 35-34-1-11 and -12, and those statutes are materially different from the standpoint of preservation of error. Further, although Davis argues that the trial court's joinder decision was prejudicial to him, he does not argue that the trial court's decision was contrary to the facts and circumstances before the court or that the court misapplied the law in making its decision. The lack of clarity on these issues in the briefing is reflected in Indiana's case law.

### 1.1 An objection to a motion for joinder is sufficient to preserve appellate review of the correctness of the trial court's decision to grant that motion.

[19] We begin with the threshold question of whether Davis's challenge to the trial court's decision to grant the State's motion for joinder is properly before us. Indiana Code section 35-34-1-9 permits the State to join offenses or defendants in one information based on certain circumstances. That statute does not speak

to the State needing a trial court's permission to join offenses or defendants. *See* I.C. § 35-34-1-9. That is, under the statute, the State may, at least in an initial information, join offenses or defendants in one information of the State's own accord. *See id.* Here, however, the State filed a motion to *amend* the information (and, in doing so, join the defendants) because the omnibus date had passed, and, thus, amending the information required the trial court's approval. *See* I.C. § 35-34-1-5(a); *see also* Appellant's App. Vol. 2, p. 139.

[20] Where the State has joined offenses or defendants in an information, Indiana Code section 35-34-1-11 provides a defendant with an opportunity to file a motion to sever offenses or for a separate trial. The trial court must grant a defendant's motion to sever offenses in some situations. *See* I.C. § 35-34-1-11(a). The court must compel the prosecutor to make certain elections upon a defendant's motion for a separate trial in other situations. *See* I.C. § 35-34-1-11(b). Outside of those mandatory circumstances, the trial court retains discretion in how to rule on a motion to sever offenses or for a separate trial. *See* I.C. § 35-34-1-11. But section 35-34-1-11 does not mention the mechanism by which the offenses or defendants came to be joined in the same information, namely, whether joinder occurred of the State's own accord or by way of a motion to amend with the trial court. *See id.*

[21] And the lack of identification of that mechanism continues into Indiana Code section 35-34-1-12, which provides in relevant part as follows:

> (a) A defendant's motion for severance of crimes or motion for a
> separate trial must be made before commencement of trial,

except that the motion may be made before or at the close of all the evidence during trial if based upon a ground not previously known. *The right to severance of offenses or separate trial is waived by failure to make the motion at the appropriate time.*

(b) If a defendant's pretrial motion for severance of offenses or motion for a separate trial is overruled, the motion may be renewed on the same grounds before or at the close of all the evidence during trial. *The right to severance of offenses or separate trial is waived by failure to renew the motion.*

(Emphases added.)

[22] The waiver provisions of Indiana Code section 35-34-1-12 have caused confusion among panels of our Court where, as here, the mechanism for joinder is by way of the State's motion with the trial court. One panel assessed the statutory procedure in these circumstances to be as follows:

Once the State's motion for joinder [i]s granted over [a defendant's] objection, proper procedure require[s] him to file a motion for severance . . . . Then, once his motion for severance [i]s overruled, it [i]s incumbent upon [the defendant] to renew his severance motion before or at the close of all the evidence during trial.

*Ennik v. State*, 40 N.E.3d 868, 875 (Ind. Ct. App. 2015) (quotation marks omitted), *trans. denied*. That is, under *Ennik*, a defendant must lodge his or her objection with the State's request for a joint trial in triplicate: first, object to the State's motion for joinder; second, file a pretrial motion for a separate trial; and, third, renew the motion at trial. *See id.* Under *Ennik*, a defendant's failure to

follow each of those steps results in waiver of appellate review of joinder-and-severance issues. *Id.*

[23] Another panel of this Court, however, has held that an objection to the State's motion for joinder along with a "renew[al]" of that objection at the beginning of trial under section 35-34-1-12(b) "is sufficient to have the issue" of joinder "reviewed on its merits." *Taylor v. State*, 236 N.E.3d 700, 707 (Ind. Ct. App. 2024), *trans. not sought*. In so holding, *Taylor* appears to consolidate *Ennik*'s first two steps by treating an objection to the State's motion for joinder as the equivalent to a section 35-34-1-12(a) motion for a separate trial. *See id.* Thus, under *Taylor*, the defendant need only repeat him- or herself one time, instead of twice, by renewing the objection at trial in accordance with Indiana Code section 35-34-1-12(b) in order to preserve appellate review of the issue. *See id.*

[24] But the Indiana Supreme Court has not adopted either of those positions. *Cf. Evans v. State*, 542 N.E.2d 546, 549 (Ind. 1989) (holding that the defendant waived appellate review of joinder where he took *no* steps under sections 35-34-1-9 or 12 to challenge the State's motion or the trial court's decision). To the contrary, it appears that our Supreme Court has reviewed the merits of a trial court's joinder decision based only on the defendant's objection to the State's motion. *Peck v. State*, 563 N.E.2d 554, 556-58 (Ind. 1990). Our Supreme Court's opinion in *Peck* makes no mention of Indiana Code sections 35-34-1-11 or -12 and makes no mention of whether the defendant in that case either did or did not file a pretrial motion for a separate trial and lodge a renewed objection at trial. *See id.* And at least one other panel of our Court has taken the same

approach as *Peck* and reviewed the merits of a trial court's joinder decision based only on the defendant's objection to the State's motion. *Angulo v. State*, 191 N.E.3d 958, 967-68 (Ind. Ct. App. 2022), *trans. denied*.

[25] We follow our Supreme Court's approach. As the Court has held in other contexts: "Requiring additional requests where the trial court already overruled an objection appears in actuality to be futile, as it only seems logical that those requests would be denied as well." *Konkle v. State*, 253 N.E.3d 1068, 1080-82 (Ind. 2025). Further, *Peck* is entirely consistent with the purposes of the rule that an issue is waived for appellate review if it is not presented to the trial court first:

> This rule exists because trial courts have the authority to hear and weigh the evidence, to judge the credibility of witnesses, to apply the law to the facts found, and to decide questions raised by the parties. Appellate courts, on the other hand, have the authority to review questions of law and to judge the sufficiency of the evidence supporting a decision. The rule of waiver in part protects the integrity of the trial court; it cannot be found to have erred as to an issue or argument that it never had an opportunity to consider. . . .

*GKC Ind. Theatres, Inc. v. Elk Retail Invs., LLC*, 764 N.E.2d 647, 651 (Ind. Ct. App. 2002) (citations omitted).

[26] Thus, although *Peck* does not explicitly say as much, we conclude that where, as here, the mechanism for joinder of defendants is by way of the State's motion with the trial court, and the defendant timely objects to the State's motion, the defendant has preserved for appellate review his argument that the joinder is

improper under Indiana Code section 35-34-1-9.[4] *Cf.* Ind. Evidence Rule 103(b) ("Once the court rules definitively on the record at trial a party need not renew an objection . . . to preserve a claim of error for appeal."). The conclusions in *Ennik* and *Taylor* that more is required for a defendant to preserve appellate review of the trial court's joinder decision under section 35-34-1-9 are inconsistent with *Peck* and with the purposes of the rule of waiver, and accordingly, we decline to follow them.[5] Davis timely objected to the State's motion for joinder under Indiana Code section 35-34-1-9, and we therefore proceed to the merits of his argument.

### 1.2 Davis fails to demonstrate either error or prejudice in the trial court's joinder decision.

[27] As for the merits of Davis's argument on appeal, the parties rely on the following standard of review from *Peck*, which has been frequently quoted by our Court for review of joinder-and-severance issues:

> Absent any statutory provision for consolidated trials of separately-charged defendants,[6] it is within the trial court's

---

[4] For its part, the State agrees that Davis has preserved our review of the merits of his objection to joinder. Appellee's Br. at 20 n.4.

[5] This is not to say, if new information timely comes to the defendant's attention that merits reconsideration of a denied objection to joinder, that the defendant may rely on the prior objection and ruling to preserve appellate review of the joinder decision in light of those new circumstances. Indeed, Indiana Code section 35-34-1-12 expressly permits a defendant to request severance based on new information all the way through the close of all the evidence during trial. Thus, if something that was previously unexpected happens during trial that the defendant perceives as prejudicial, he or she may move for severance at that time accordingly. I.C. § 35-34-1-12.

[6] Again, Indiana Code section 35-34-1-9 speaks to the State's authority to join offenses or defendants in one information, not the trial court's authority.

discretion to determine whether defendants' trials should be joined. To show an abuse of discretion, an appellant must show that[,] in light of what occurred at trial, the denial of a separate trial subjected him to actual prejudice.

563 N.E.2d at 557; *see also, e.g.*, *Cotto v. State*, No. 23A-CR-252, 2024 WL 175915, at *3 (Ind. Ct. App. Jan. 17, 2024) (mem.), *trans. denied*. More traditionally, a trial court abuses its discretion when its decision is contrary to "the logic and effect of the facts and circumstances before the court" or the court misapplies the law. *E.g.*, *Corcoran v. State*, 246 N.E.3d 1223, 1225 (Ind. 2024). And our Supreme Court has made clear that, while Indiana Code section 35-34-1-9 permits the State to join defendants of its own accord, when the State moves the trial court for joinder the court's decision remains "well within [its] discretion . . . ." *Hatchett v. State*, 503 N.E.2d 398, 401 (Ind. 1987).

[28] Following *Peck*, Davis argues *only* that he suffered actual prejudice as a result of the trial court's joinder decision. But the standard of review stated in *Peck* predates our Supreme Court's adoption of the modern Indiana Appellate Rules. In particular, Indiana Appellate Rule 66(A) provides:

> No error or defect in any ruling or order or in anything done or omitted by the trial court or by any of the parties is ground for granting relief or reversal on appeal where its probable impact, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties.

Noting inconsistent treatment in Indiana's prior case law for considering when reversible error has occurred, our Supreme Court has clarified:

> Appellate Rule 66(A) . . . defines reversible error for our appellate courts. When an appellate court must determine whether a non-constitutional error is harmless, Rule 66(A)'s "probable impact test" controls. Under this test, the party seeking relief bears the burden of demonstrating how, in light of all the evidence in the case, the error's probable impact undermines confidence in the outcome of the proceeding below. Importantly, this is not a review for the sufficiency of the remaining evidence; it is a review of what was presented to the trier of fact compared to what should have been presented. And when conducting that review, we consider the likely impact of the improperly admitted or excluded evidence on a reasonable, average jury in light of all the evidence in the case. Ultimately, the error's probable impact is sufficiently minor when—considering the entire record—our confidence in the outcome is not undermined.

*Hayko v. State*, 211 N.E.3d 483, 492 (Ind. 2023) (citations and footnote omitted).

[29] In other words, to demonstrate reversible error in a trial court's discretionary joinder decision, an appellant must show *both* that the trial court abused its discretion in joining the defendants *and also* that the probable impact of that erroneous decision undermines the confidence we should have in the outcome of his or her trial. *See id.* However, Davis's only argument on appeal is that the trial court abused its discretion *because* of the purported after-the-fact impact on his trial outcome. But that prejudice occurred is of no moment if that prejudice was the result of the proper application of the law. *See, e.g.*, *Firth v. State*, 263 Ind. 100, 110, 325 N.E.2d 186, 192 (1975) ("There is no constitutional right to be protected from damaging evidence."). Absent a threshold showing of trial court error—*i.e.*, that the court's decision to grant the State's joinder motion was contrary to the logic and effect of the facts and circumstances before the

court at the time it made its decision or was a misapplication of the law—Davis cannot succeed on this issue. *See* Ind. Appellate Rule 46(A)(8)(a).

[30]     Further, here, any abuse of the trial court's discretion did not have a meaningfully probable impact on Davis's trial. Davis concedes that he and Rodriguez did not have "antagonistic defenses." Appellant's Br. at 29. He argues that prejudice instead occurred because the State introduced text messages Rodriguez had made to him, and he could not call Rodriguez to the stand to challenge those messages or Rodriguez's credibility. While Davis frames this as a denial of his right to cross-examine Rodriguez, it is better framed as Rodriguez's own protection against self-incrimination, a right that Rodriguez held regardless of whether he was Davis's codefendant. *See Angulo*, 191 N.E.3d at 967-68 (citing *Bleeke v. Lemmon*, 6 N.E.3d 907, 925 (Ind. 2014)). And Davis has not established that Rodriguez would have been willing to waive that right had he been tried separately from Davis.

[31]     Davis also asserts that he was prejudiced because the evidence against Rodriguez was "highly prejudicial," which the jury may have imputed to Davis, and because the robbery conviction could have been based on Rodriguez's taking of the tote and rifle from Kates's vehicle rather than the taking of the money from Kates's black pouch. Appellant's Br. at 30. But these arguments assume that the jury was not capable of following the jury instructions or parsing the evidence, which assumptions we have no reason to accept. *See, e.g.*, *Hatchett*, 503 N.E.2d at 402 (recognizing that a trial court does not abuse its discretion in refusing to order separate trials on a theory of guilt-

by-association where the evidence presents clearly defined and distinctive roles for each defendant and there is no confusion over who did what) (quoting *Johnson v. State*, 423 N.E.2d 623, 629 (Ind. Ct. App. 1981)). Thus, Davis's arguments fail.

[32] For all of these reasons, the trial court did not err when it granted the State's motion for joinder of the defendants.

## 2. Davis has not sufficiently challenged the State's race-neutral reasons in response to his *Batson* objection.

[33] We next consider Davis's challenge to the trial court's decision to overrule his *Batson* objection.[7] As we have explained:

> When a party raises a *Batson* challenge, the trial court must engage in a three-step test. *Highler v. State*, 854 N.E.2d 823, 826 (Ind. 2006). "First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race." *Id.* at 826-27. Second, "the burden shifts to the State to present a race-neutral explanation for striking the juror." *Id.* at 827. Third, the trial court must evaluate "'the persuasiveness of the justification' proffered by the prosecutor, but 'the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.'" *Id.* at 828 (quoting *Purkett v. Elem*, 514 U.S. 765, 768, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995) (per curiam)). We afford great deference to a trial

---

[7] Davis objected only to the State's use of a peremptory challenge to strike Prospective Juror 67. Unlike Rodriguez, Davis did not object to the State's decision to strike Prospective Juror 15. Thus, his arguments on appeal notwithstanding, we limit our review to the trial court's decision to deny his objection to the State's striking of Prospective Juror 67.

court's determination that a prosecutor's motivation for striking a juror was not improper, and will reverse only if we conclude the trial court's decision was clearly erroneous. *Id.*

*Schumm v. State*, 866 N.E.2d 781, 789 (Ind. Ct. App.), *clarified on other grounds on reh'g*, 868 N.E.2d 1202 (Ind. Ct. App. 2007).

[34] As noted above, after Davis raised his *Batson* objection, the State proffered at least four race-neutral reasons for striking Prospective Juror 67, namely: (1) that he "would feel responsible for sending someone away" and that it "would possibly influence his judgement [sic]"; (2) that he had stated that a codefendant who "didn't pull the trigger . . . should be guilty of a lesser charge"; (3) that he had left multiple answers blank on the jury questionnaire; and (4) that the State's background check of the juror showed that he had "multiple family members that had been convicted of crimes," which the juror did not disclose. Tr. Vol. 2, pp. 16-17.

[35] Because the State offered facially race-neutral reasons for striking Prospective Juror 67, Davis had an additional opportunity to demonstrate that the State's reasons were in fact pretextual. *See Addison v. State*, 962 N.E.2d 1202, 1209-10 (Ind. 2012). But, with that opportunity, he argued only that other prospective jurors had also expressed hesitation about the weight of the responsibility of being a juror. Davis presented no argument to the trial court to challenge the facial validity of the State's other race-neutral reasons for striking Prospective Juror 67.

Likewise on appeal, Davis merely challenges the State's first race-neutral reason for striking Prospective Juror 67. Appellant's Br. at 35. But that is insufficient to demonstrate that the trial court's decision to overrule his *Batson* objection is clearly erroneous given the State's other, unchallenged race-neutral justifications. As for Davis's statement that the trial court "failed to meaningfully engage" in the *Batson* analysis, we conclude that Davis's assertion is not an argument supported by cogent reasoning. *Id.* at 36; *see* App. R. 46(A)(8)(a). We therefore reject Davis's *Batson* arguments.

## 3. The prosecutor did not commit fundamental error in her rebuttal statements.

We next address Davis's argument that the prosecutor's statements on rebuttal were fundamental error. As our Supreme Court has made clear:

> Our standard of review is different where a claim of prosecutorial misconduct has been procedurally defaulted for failure to properly raise the claim in the trial court. . . . The defendant must establish not only the grounds for prosecutorial misconduct but must also establish that the prosecutorial misconduct constituted fundamental error. Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to make a fair trial impossible. In other words, to establish fundamental error, the defendant must show that, under the circumstances, the trial judge erred in not *sua sponte* raising the issue because alleged errors (a) constitute clearly blatant violations of basic and elementary principles of due process and (b) present an undeniable and substantial potential for harm. The element of such harm is not established by the fact of ultimate conviction but rather depends upon whether the

defendant's right to a fair trial was detrimentally affected by the denial of procedural opportunities for the ascertainment of truth to which he otherwise would have been entitled. In evaluating the issue of fundamental error, our task in this case is to look at the alleged misconduct in the context of all that happened and all relevant information given to the jury—including evidence admitted at trial, closing argument, and jury instructions—to determine whether the misconduct had such an undeniable and substantial effect on the jury's decision that a fair trial was impossible.

We stress that a finding of fundamental error essentially means that the trial judge erred by not acting when he or she should have. Fundamental error is meant to permit appellate courts a means to correct the most egregious and blatant trial errors that otherwise would have been procedurally barred, not to provide a second bite at the apple for defense counsel who ignorantly, carelessly, or strategically fail to preserve an error. *See Baer v. State*, 942 N.E.2d 80, 99 (Ind. 2011) (noting it is "highly unlikely" to prevail on a claim of fundamental error relating to prosecutorial misconduct); *Stevens v. State*, 691 N.E.2d 412, 420 n.2 (Ind. 1997); *Wilson v. State*, 222 Ind. 63, 83, 51 N.E.2d 848, 856 (1943).

*Ryan v. State*, 9 N.E.3d 663, 667-68 (Ind. 2014) (citation modified).

[38] Davis complains that the prosecutor committed misconduct that denied him a fair trial when the prosecutor, in responding to the defendants' self-defense theory, described Rodriguez as "so cold and callus [sic] that he sat around while this man was dying on his floor and counted out the money that he just took from his dead cold hands," and further described Rodriguez's actions in the surveillance videos as "probably listening to Tim Kates taking his last breaths

and gurgling and heard that and ran out the door." Tr. Vol. 5, pp. 88-89. According to Davis, those comments were designed to inflame the emotions of the jury, blur the line between the defendants, and, in doing so, obtain a conviction against him based on something other than the evidence.

[39] We are not persuaded. Notably, Davis does not suggest that the prosecutor mischaracterized the evidence or improperly responded to his self-defense theory. Rather, his complaint on appeal is that her colorful description of the evidence was so over-the-top that it denied him a fair trial. We reject his argument and conclude that the prosecutor's comments were neither misconduct nor fundamental error. *Cf. Ryan*, 9 N.E.3d at 672-73 (holding that no fundamental error occurred despite prosecutorial misconduct).

## 4. The State presented sufficient evidence to support Davis's convictions.

[40] Davis next contends that the State failed to present sufficient evidence to support his convictions for murder and Level 3 felony robbery. For challenges to the sufficiency of the evidence, we consider only the probative evidence and the reasonable inferences therefrom that support the judgment of the trier of fact. *Hall v. State*, 177 N.E.3d 1183, 1191 (Ind. 2021). We will neither reweigh the evidence nor judge witness credibility. *Id.* We will affirm a conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id.*

[41] To show that Davis committed murder, the State was required to prove beyond a reasonable doubt that Davis knowingly or intentionally killed Kates. I.C. § 35-42-1-1. To show that Davis committed Level 3 felony robbery as charged, the State was required to prove beyond a reasonable doubt that he knowingly or intentionally took property from Kates by using force on Kates, and Davis did so while armed with a deadly weapon. I.C. § 35-42-5-1(a)(1).

[42] Davis argues that the State's evidence was insufficient to support his convictions because there was no "direct evidence" that he killed and robbed Kates. Appellant's Br. at 37. Davis surmises that the jury was left to "speculate" on those conclusions based on the State's evidence. *Id.* He also argues that the State's evidence failed to disprove his theory of self-defense.

[43] Davis is incorrect. The State had admitted into the record text exchanges between Davis and Rodriguez in which they lamented their needs for cash and in which they demonstrated a plan to commit armed robbery against Kates. The State also had admitted into evidence Vasquez's surveillance videos. Those videos showed Davis enter the residence where he knew Kates to be, and, before the door had even closed behind Davis, there were numerous rapid-fire gunshots. Moments later, Davis fled the residence holding a handgun and carrying cash. The location of the bullet casings inside the house were compatible with a gun fired near the door; all the bullets that hit Kates's body did so from his back or side; and Kates's black pouch, which earlier had been seen with cash inside it, was empty. Accordingly, the State presented sufficient

evidence to support Davis's convictions and from which any reasonable fact-finder would reject his theory of self-defense.

## 5. Davis's sentence is not inappropriate.

[44] Davis's final argument on appeal is that his ninety-six-year aggregate sentence is inappropriate in light of the nature of the offenses and his character.[8] Under Indiana Appellate Rule 7(B), we may modify a sentence that we find is "inappropriate in light of the nature of the offense and the character of the offender." Making this determination "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008).

[45] However, sentence modification under Rule 7(B) is reserved for "a rare and exceptional case." *Livingston v. State*, 113 N.E.3d 611, 612 (Ind. 2018) (per curiam). Thus, when conducting this review, we will defer to the sentence imposed by the trial court unless the defendant demonstrates compelling evidence that portrays the nature of the offense and his character in a positive light, such as showing a lack of brutality in the offenses or showing substantial virtuous character traits. *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

---

[8] Davis asserts that the trial court did not give proper weight to certain proffered mitigators, but the legal analysis in his brief is an Appellate Rule 7(B) analysis. We construe his comment about the weight of the proffered mitigators to be a request for our Court to review and revise his sentence under Rule 7(B) accordingly.

[46] The sentencing range for murder is forty-five to sixty-five years, with an advisory term of fifty-five years. I.C. § 35-50-2-3(a). The sentencing range for a Level 3 felony is three to sixteen years, with an advisory sentence of nine years. I.C. § 35-50-2-5(b). And, for being a habitual offender, Davis faced an additional fixed term of between six and twenty years. I.C. § 35-50-2-8(i). Thus, Davis faced a maximum possible term of 101 years in the Department of Correction. After finding significant aggravators and no mitigators, the trial court ordered Davis to serve sixty-five years for murder, sixteen years for Level 3 felony robbery, and fifteen years for being a habitual offender.

[47] Davis's ninety-six-year aggregate sentence is not inappropriate. He argues that "the nature of the offense[s] remain[] unclear" and that his plea of guilty to the habitual offender allegation should have entitled him to some sentencing mitigation. Appellant's Br. at 27. We are not persuaded.

[48] Regarding the nature of the offenses, Davis planned an armed robbery of Kates that resulted in murder when Davis re-entered the residence and Kates was shot six times in the back and side. He then fled the scene and Indiana altogether. Regarding his character, Davis does not dispute his lengthy criminal history, which the trial court characterized as having breaks between offenses only due to Davis's incarceration or court supervision. And Davis does not present any compelling evidence that portrays the nature of the offenses and his character in a positive light. We therefore conclude that his sentence is not inappropriate.

## Conclusion

[49] For all of these reasons, we affirm Davis's convictions and sentence.

[50] Affirmed.

Vaidik, J., and Pyle, J., concur.

ATTORNEY FOR APPELLANT

Joshua Cumming
SDHMR Law Group
Noblesville, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana